# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

BIGLER JOBE STOUFFER,

          Plaintiff,

    vs.

SCOTT CROW,
RANDY CHANDLER,
BETTY R, GESELL,
JOSEPH A. GRIFFIN,
F. LYNN HAUETER,
KATHERYN A. LAFORTUNE,
STEPHAN MOORE,
CALVIN PRINCE,
T. HASTINGS SIEGFRIED,
DAYRL WOODARD,
JIM FARRIS,
JUSTIN FARRIS,
MICHAEL CARPENTER,
JUSTIN GIUDICE,
PARAMEDIC Y,
EXECUTIONER #1,
EXECUTIONER #2 AND
EXECUTIONER #3,

          Defendants.

**Civil Action No.**    CIV-21-1000-HE

**JURY TRIAL DEMANDED**

# CAPITAL CASE

# PENDING EXECUTION DATE:   DECEMBER 9, 2021

# FILED PURSUANT TO 42 U.S.C. § 1983

## I.    <u>Nature Of Action</u>

1.      Plaintiff Bigler Jobe Stouffer ("Plaintiff") was the only person on Oklahoma's death row to be left out of the action titled *Glossip v. Chandler, et al.*, Civ. No. 14-cv-665-F, U.S. District Court, W.D. Oklahoma ("*Glossip*"). Plaintiff wanted to participate as a plaintiff in Glossip. By written letter, however, Plaintiff's request to participate in *Glossip* was rejected by class counsel. In pertinent part, attorneys for the plaintiffs in *Glossip* stated "Unfortunately, we will not be able to assist with your matters but wish you the best of luck. "Now, because the Honorable Judge Stephen P. Friot, United States District Judge of the Western District of Oklahoma, has determined the State of Oklahoma may proceed to execute the death sentences of all plaintiffs in *Glossip* who did not choose an alternative manner of execution, Plaintiff has been lumped-in with those plaintiffs and is scheduled to be executed on December 9, 2021. This is despite the fact Plaintiff has not been provided the opportunity to make such a choice.

2.      Additionally, Plaintiff was informed by the plaintiffs' attorneys in *Glossip* that they did not believe he would suffer any harm by not being a part of the *Glossip* case.  This was obviously a miscalculation on their part and Plaintiff should be allowed his day in court on these issues.

3.      Plaintiff brings this action seeking injunctive and declaratory relief for: (a) actual and threatened violations of his right under the Eighth Amendment of the United States Constitution to be free from cruel and unusual punishment; (b) actual and threatened violations of his right of access to counsel under the First, Fifth, and Sixth Amendments of the United States Constitution; (c) actual and threatened violations of his right to due process under the

2

Fourteenth Amendment of the United States Constitution; (d) actual and threatened violations of Section 3599(a)(2) of Title 18 of the U.S. Code; (e) actual and threatened violations of the ex post facto provision of the United States Constitution and Article V, Section 54 of the Oklahoma Constitution; (f) actual and threatened violations of his right to religious liberty under the First Amendment to the United States Constitution due to the alternative pleading requirement; (g) actual and threatened violations of the right to be free from human experimentation under the Eighth and Fourteenth Amendments to the United States Constitution; (h) actual and threatened violations of the right to access to governmental information under the First and Fourteenth Amendments to the United States Constitution; (i) Violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States because of the denial of Plaintiff's right to be placed on equal footing with all other death row inmates, all of whom were represented in Glossip; and (j) declaratory relief that the "beyond a reasonable standard of proof" as applied to defendants facing a death penalty offense is unconstitutional and is an actual and threatened violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

4.      Plaintiff was sentenced to death by an Oklahoma court pursuant to 22 Okla. Stat. Ann. § 1014(A). At the time Plaintiff's judgment was entered, the statute provided that executions by lethal injection must "be inflicted by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent until death is pronounced by a licensed physician according to accepted standards of medical practice." 22 Okla. Stat. Ann. § 1014(A). Defendants include the individuals charged with carrying out Plaintiff's death sentences.

3

5.     On February 13, 2020, the Oklahoma Department of Corrections ("ODOC") released a revised OSP Policy No. OP-040301, Execution of Offenders Sentenced to Death (the "Execution Protocol"), effective February 20, 2020, to be utilized in the executions of prisoners, including Plaintiff. The same day, then Oklahoma Attorney General Michael Hunter announced that execution of Plaintiff will be conducted utilizing a three-drug protocol (set forth in Chart D of Attachment D to the Execution Protocol) utilizing intravenous injections of midazolam, vecuronium bromide, and potassium chloride.

6.     The sentence of Plaintiff has become final. Upon information and belief, Defendants will carry out the execution of Plaintiff pursuant to the Execution Protocol, including Chart D of Attachment D to the Execution Protocol.

7.     As discussed more fully below, the implementation and use of the Execution protocol, including Chart D of Attachment D to the Execution Protocol, violates Plaintiff's rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution, and violates the Oklahoma Constitution.

8.     Accordingly, Plaintiff seeks the following relief in this action: (a) a permanent injunction preventing the Defendants from executing him pursuant to the Execution Protocol; (b) an order declaring that the implementation or use of the Execution Protocol violates Plaintiff's rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution; (c) an order declaring that the adoption and use of the Execution Protocol violates the Oklahoma Constitution; and (d) any such other equitable relief as this Court deems just and proper.

9.     The claims in this Complaint are cognizable under the constitutional and statutory

grounds identified herein and described in more detail below. This action is not, and should not be treated as, a successor habeas corpus petition. While Plaintiff is not challenging the mechanisms of the appeals and the habeas corpus process, Plaintiff submits that based on the recommendations of the Commission and the evolving standards of decency in American society, a higher standard of proof needs to be applied in cases wherein the state is seeking a death sentence. Plaintiff is not challenging through this action the validity of his convictions or death sentences. Rather, Plaintiff asserts that the Execution Protocol, by which his execution is to be implemented, violates the United States Constitution, the Oklahoma Constitution, and other applicable laws in that there is no mechanism in place to insure absolute certainty of the guilt of those the state executes.

## II.    <u>Parties</u>

10.   Plaintiff is incarcerated at the Oklahoma State Penitentiary ("OSP"), 1301 N. West Street, McAlester, Oklahoma, under the control and supervision of the ODOC.

11.   Defendant Scott Crow is Director of ODOC. Under Oklahoma law, Defendant Crow is responsible for carrying out the death sentences of Oklahomaprisoners. Defendant Crow is sued in his official capacity for the purpose of obtainingdeclaratory and injunctive relief.

12.   Defendants Randy Chandler, Betty R. Gesell, Joseph A. Griffin, F. Lynn Haueter, Kathryn A. LaFortune, Stephan Moore, Calvin Prince, T. Hastings Siegfried, and Daryl Woodard, are current members of the Oklahoma Board of Correction who establish policies for the ODOC. Each of these Defendants is sued in his or her official capacity for the purpose of obtaining declaratory and injunctive relief.

13.   Defendant Jim Farris is Warden of the OSP with responsibility for carrying out death warrants issued by Oklahoma courts, including warrants pertaining to Plaintiff. Defendant Farris is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

14.   Defendant Justin Farris is the Chief of Staff of the ODOC and responsible for ensuring that executions comply with the Execution Protocol. Defendant Farris is  sued in his  official  capacity  for  the  purpose of obtaining declaratory and injunctive relief.

15.   Defendant Michael Carpenter is Chief of Operations and responsible for ensuring that all execution team members understand and comply with the lethal- injection procedures. Defendant Carpenter is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

16.   Defendant Justin Giudice is the Employee Assistance Program Coordinator,and is the team leader of the Critical Incident Management Team ("CIMT"), responsible for educating affected staff before, during, and after the execution  regarding psychological responses to the execution. Defendant Giudice is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

17.   Defendants John Does I-X are employed by, or have contracted with, the ODOC to consult with, prepare for, participate in, and/or carry out the execution of Plaintiff. Plaintiff does not know, and the ODOC Defendants have not revealed, the identities of the John Does I-X. Defendants John Does I-X are sued in their official capacities for the purpose of obtaining declaratory and injunctive relief.

### III.   Exhaustion Of Administrative Remedies

18.   Exhaustion of administrative remedies is not necessary because this action does not challenge prison conditions and because there are no available administrative remedies capable of addressing the violations of federal law challenged in this pleading. Moreover, because Defendant Crow has unfettered discretion to change the Execution Protocol at any time – even after providing notice as to certain aspects – any attempt to grieve would be futile.

## IV.    Jurisdiction And Venue

19.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because this action arises and seeks relief under the laws and Constitution of the United States, specifically, the First, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief).

20.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the ODOC is headquartered in this District and a substantial part of the events giving rise to the claims made herein by Plaintiff, including the formulation of the Execution Protocol, took place and continue to take place in this District.

## V.    Factual Background

### A.    The History Of Execution By Lethal Injection In Oklahoma

21.    In 1977, Oklahoma adopted lethal injection as a manner of inflicting punishment of death. 22 Okla. Stat. Ann. § 1014(A).

22.    Beginning in 1977 and until November 2011, Oklahoma law provided that "[t]he punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent until

7

death is pronounced by a licensed physician according to accepted standards of medical practice." 22 Okla. Stat. Ann. § 1014(A).

23.     Plaintiff was sentenced to death prior to November 2011, when 22 Okla. Stat. Ann. § 1014(A) provided that "[t]he punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate."

24.     The first execution protocol promulgated by ODOC in 1978 was a two- drug protocol utilizing thiopental and a paralytic, although that protocol was never used in an execution. In 1981, ODOC amended the execution protocol to add potassium chloride as the third drug in the execution process.

25.     Oklahoma carried out its first execution by lethal injection in 1990. Between 1990 and 2011, Oklahoma carried out executions pursuant to 22 Okla. Stat. Ann. § 1014(A) utilizing a three-drug protocol: (1) an ultrashort-acting barbiturate intended to induce and maintain anesthesia and render the prisoner unconscious and insensate to pain and suffering throughout the execution; (2) a paralytic to paralyze the prisoner and eliminate all movement and communication during the execution; and (3) potassium chloride to induce cardiac arrest and cause death.

26.     In at least 93 executions carried out by Oklahoma between 1990 and 2010, ODOC utilized sodium thiopental, an ultrashort-acting barbiturate, as the first drug in the three-drug procedure.

27.     In 2010, ODOC began using pentobarbital, another barbiturate, in place of sodium thiopental, as the first drug in the three-drug procedure.

28.     In November 2011, Oklahoma amended 22 Okla. Stat. Ann. § 1014(A). The new

statute does not require a "continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate," but, rather, that the "punishment of death shall be carried out by the administration of a lethal quantity of a drug or drugs until death is pronounced by a licensed physician according to accepted standards of medical practice." 22 Okla. Stat. Ann. § 1014(A), eff. Nov. 1, 2011.

29.     In March 2014, Oklahoma revised the execution protocol to include the option of midazolam as the first drug in the three-drug protocol.

30.     Oklahoma used midazolam for the first time in the execution of Clayton Lockett on April 29, 2014. The Emergency Medical Technician and the physician on the execution team worked for nearly an hour to establish intravenous (IV) access. They made at least twelve attempts resulting in puncture wounds to Mr. Lockett's arms, foot, jugular vein, and subclavian vein. The physician finally gained IV access by setting a femoral line in Mr. Lockett's right groin area, but no back-up IV line was set. The Warden directed the team to cover Mr. Lockett's groin area, preventing the team from monitoring the IV insertion point to ensure it remained in place throughout the execution.

31.     The execution team administered Mr. Lockett 100 milligrams of midazolam and the physician determined Mr. Lockett was still conscious. Two minutes later, the physician checked again and determined he was unconscious. After the full dose of vecuronium bromide and most, but not all, of the potassium chloride were administered, Mr. Lockett regained consciousness. He began to strain against the restraints, buck his head, and speak. Witnesses reported that Mr. Lockett said, "this shit is fucking with my mind," "something is wrong," and "the drugs aren't working." The physician lifted the sheet covering Mr. Lockett's groin area,

determined that the IV had infiltrated and that some amount of the drugs had been injected into his tissue instead of the vein.

32.     The Warden ordered the open blinds between the execution chamber and witness room closed.   The physician then attempted to start another femoral IV line in Mr. Lockett's left side, but punctured his artery instead of accessing his vein. The ODOC Director and Oklahoma Governor Mary Fallin called off the execution, but Mr. Lockett died twenty-four minutes later.

33.     On April 30, 2014, Governor Fallin issued Executive Order 2014-11 appointing the Commissioner of the Oklahoma Department of Public Safety ("DPS") to undertake a full investigation of the events leading up to, and the circumstances of, Mr. Lockett's execution.

34.     In September 2014, the ODOC amended the Execution Protocol to increase the dosage of the paralytic vecuronium bromide from 40 milligrams to 100 milligrams. Upon information and belief, ODOC more than doubled the dosage of the paralytic because it had reason to believe midazolam was not adequately rendering prisoners unconscious and insensate.     The increase was necessary to ensure prisoners were completely paralyzed and unable to communicate or exhibit signs of pain and suffering experienced during the execution process.

35.     On September 30, 2014, DPS issued a report concluding that the execution of Mr. Lockett was "fundamentally sound," but also identifying specific errors that occurred during the execution, as well as systemic problems with ODOC's approach to carrying out executions. Notably, however, DPS did not investigate the specific drugs used in executions, particularly midazolam, and did not make any determination regarding the effectiveness of

midazolam for its intended purpose.

36.     Oklahoma used midazolam again in the execution of Charles Warner on January 15, 2015. Mr. Warner was administered 500 milligrams of midazolam, and was heard saying, "My body is on fire. No one should go through this." Several minutes later, Mr. Warner was declared unconscious. He was administered 100 milligrams of the paralytic rocuronium bromide and 240 milliequivalents of potassium acetate. The execution protocol in place at the time required administration of potassium chloride, but Oklahoma had erroneously purchased potassium acetate in lieu of potassium chloride. The Special Operations Team Leader inventoried the drugs on the day of Mr. Warner's execution and recorded the receipt of potassium acetate, but did not alert anyone in the department that the wrong drug had been ordered. As the potassium acetate was being administered to Mr. Warner, he experienced visible chest movements and his lips fluttered.

37.     Richard Glossip was scheduled to be executed on September 30, 2015. Shortly before the scheduled execution, ODOC discovered that it had used the wrong drug, potassium acetate, in Mr. Warner's execution, and that it had obtained the same wrong drug to use in Mr. Glossip's execution. After an internal debate in which some state officials advocated for moving forward using the incorrect drug, Mr. Glossip's execution was stayed by Governor Fallin.

38.     On October 1, 2015, at the request of Attorney General Scott Pruitt, the Oklahoma Court of Criminal Appeals ("OCCA") issued an order staying all executions pending a multi-county grand jury investigation into the circumstances surrounding the botched executions of Messrs. Lockett and Warner and the aborted execution of Mr. Glossip.

## B.    The Grand Jury Investigation And Report

39.    In sessions between October 2015 and May 2016, the Fifteenth Multi- County Grand Jury (the "Grand Jury") received evidence "related to the use and attempted use of potassium acetate by the [ODOC] in the execution of [Warner] and the scheduled execution of [Glossip]."

40.    In May 2016, the Grand Jury issued "Interim Report Number 14" (the "Interim Report") detailing its findings and recommendations. The Grand Jury found that ODOC "staff, and others participating in the execution process, failed to perform their duties with the precision and attention to detail the exercise of state authority in such cases demands," noting that "[b]ased on these failures, justice has been delayed for the victims' families and the citizens of Oklahoma, and confidence further shaken in the ability of this State to carry out the death penalty." The Grand Jury specifically determined that ODC staff and others participating in the execution process had failed in the following respects:

- "the Director of the [ODOC] orally modified the execution protocol without authority;

- the Pharmacist ordered the wrong execution drugs;

- the Department's General Counsel failed to inventory the execution drugs as mandated by state purchasing requirements;

- an agent with the Department's Office of Inspector General . . . failed to inspect the execution drugs while transporting them into the OSP;

- [a warden] failed to notify anyone in the Department that potassium acetate had been received;

12

- the H-Unit Section Chief failed to observe the Department had received the wrong execution drugs;

- the IV team failed to observe the Department had received the wrong execution drugs;

- the Department's Execution Protocol failed to define important terms, and lacked controls to ensure the proper execution drugs were obtained and administered; and

- the Governor's General Counsel advocated the Department proceed with the Glossip execution using potassium acetate." (Id. at 1–2).

41.     The Interim Report also concluded that the Execution Protocol "was vague and poorly drafted" (Doc. 303-3 at 77–81); that "most Department employees profoundly misunderstood the Protocol," (id. at 105); and that the trainings failed to ensure that all participants gained "intimate knowledge of the policies and protocols surrounding an execution," which "demands something more than repeated dry-runs and walk-throughs" (id.).

42.     In addition, the Interim Report found that the ODOC's "paranoia of identifying participants clouded the Department's judgment and caused administrators to blatantly violate their own policies" (id. at 103); "had the purchase of the execution drugs been accompanied by a timely inventory in conformity with the requirements of [state law], the potassium acetate could have been discovered" (id. at 91); "the pharmacist tasked with procuring the requisite drugs performed negligently" (id. at 93–96); "the Warden carelessly assumed others would fulfill his own oversight responsibility" (id. at 96–97); and "the IV team Leader failed to detect the improper receipt of potassium acetate" (id. at 98).

43.     The Grand Jury recommended that "the execution protocol should be revised again," and that, as part of those revisions: (a) "key terms should be defined and duties clearly assigned"; (b) "the protocol should require verification of execution drugs at every step"; (c) "administrators should not serve in dual roles"; (d) the ODOC "should follow laws requiring the documentation of purchases and inventories while still safeguarding the privacy of those participating in execution of the death penalty"; (e) the "Quality Assurance Review called for in the Protocol should be performed by an independent third party bound by confidentiality"; and (f) "individuals involved in the execution process must be thoroughly trained on the Execution Protocol." Id. at 100-06.

### C.     The Death Penalty Commission Report

44.     The Oklahoma Death Penalty Review Commission (the "Commission") was formed shortly after Oklahoma issued a moratorium on executions in October 2015. The Commission spent over a year studying all aspects of the Oklahoma death penalty system and heard "from those with direct knowledge of how the system operates – including law enforcement, prosecutors, defense attorneys, judges, families of murdered victims, and the families of those wrongfully convicted."

45.     At the conclusion of its year-long investigation, the Commission issued a 270-page report. *Okla. Death Penalty Review Comm'n*, The Report of the Okla. Death Penalty Review Comm'n, The Constitution Project, 197-98 (Apr. 25, 2017) (the "Commission Report"). The Commission unanimously recommended that, "[d]ue to the volume and seriousness of the flaws in Oklahoma's capital punishment system," the "moratorium on executions be extended until significant reforms are accomplished." Commission Report at vii.

46.     The Commission Report, which was "designed to highlight issues giving rise to urgent questions about the manner in which the death penalty is imposed and carried out in Oklahoma," described some of its own findings as "disturbing," and "question[ed] whether the death penalty can be administered in a way that ensures no innocent person is put to death." The Commission "encourage[d] the Oklahoma Legislature, executive branch, and judiciary to take actions to address the systemic flaws in Oklahoma's death penalty system," and encouraged an "informed discussion" about "whether the death penalty in [Oklahoma] can be implemented in a way that eliminates the unacceptable risk of executing the innocent, as well as the unacceptable risks of inconsistent, discriminatory, and inhumane application of the death penalty."

47.     The Commission Report laid out seven specific "recommendations" concerning Oklahoma's execution process:

a.     "Oklahoma should adopt the most humane and effective method of execution possible, which currently appears to be the one-drug (barbiturate) lethal injection protocol";

b.     the ODOC "should revise its execution protocol to provide clear direction to department personnel involved in preparing for and carrying out executions," including, "at minimum . . . specify[ing] who within the department's chain of command has the authority and responsibility to perform critical steps in the execution process";

c.     the ODOC "should amend its written execution protocol to require verification—at the point of acquisition and at all stages of the execution process—that the proper drug(s) for carrying out the execution have been obtained and will be used in any

execution" and "prohibit drug substitutions not specified within the protocol itself and should require that all drug purchases be in writing";

      d.    "[a]ll government personnel involved in carrying out an execution, as well as those individuals contracted with the government to provide services related thereto, should be thoroughly trained and evaluated on all relevant aspects of the [ODOC's] execution protocol";

      e.    the ODOC director should provide the governor prior to any scheduled execution, "a written, signed certification that the director has confirmed that all aspects of the execution protocol have been followed, including: ensuring that all personnel who will participate in the upcoming execution have been adequately trained and prepared; ensuring that the necessary equipment and facilities that will be used are adequate and satisfy the standards promulgated within [ODOC's] execution protocol; and ensuring that any drugs that will be used have been obtained pursuant to and are consistent with [ODOC's] execution protocol";

      f.    "the inmate should be provided written notice as to which drug(s) will be used at least 20 days prior to the scheduled execution"; and

      g.    "[f]ollowing any execution, an independent third party should conduct a thorough quality assurance review to determine whether state laws, regulations, and protocols were properly followed before, during, and immediately after the execution." Commission Report at 197-98.

### D.    Nitrogen Hypoxia

48.    Effective November 1, 2015, Oklahoma amended 22 Okla. Stat. Ann. § 1014 to

provide that, if execution by lethal injection "is held unconstitutional by an appellate court of competent jurisdiction or is otherwise unavailable, then the sentence of death shall be carried out by nitrogen hypoxia." Oklahoma was the first state to allow executions to be carried out by nitrogen hypoxia.

49.     On March 14, 2018, Attorney General Michael Hunter and former ODOC Director Joseph Allbaugh announced that acquiring drugs to perform executions by lethal injection had become "exceedingly difficult." Accordingly, Messrs. Hunter and Allbaugh announced that, going forward, and subject to completion of a protocol and procedures to be prepared by the ODOC, the primary method of execution in Oklahoma would be nitrogen hypoxia. Oklahoma embraced nitrogen hypoxia as its primary method of execution despite the fact that the method had never been used to execute a prisoner. Oklahoma's new execution plan using nitrogen hypoxia is therefore experimental.

50.     ODOC never issued any protocols or procedures for executions using nitrogen hypoxia.

### E.     The February 20, 2020 Execution Protocol

51.     On February 13, 2020, Oklahoma Governor Kevin Stitt, then Attorney General Michael Hunter, and ODOC then-Acting Director Scott Crow announced that Oklahoma had secured access to the drugs – midazolam, vecuronium bromide, and potassium chloride – necessary to carry out executions by lethal injection using a three-drug protocol. No details about the provenance of the drugs were provided, including whether the drugs were FDA-approved or compounded, or whether the drugs had actually been acquired by and were in the possession of ODOC.

17

52.     Then Attorney General Hunter also noted that: nitrogen hypoxia is "a humane and Eighth Amendment-appropriate alternative"; under Oklahoma law, nitrogen hypoxia would be used "only if the drugs for lethal injections are unavailable"; "good progress has been made to complete an architecture for the nitrogen hypoxia method, but we're not there yet"; and the Attorney General's office was "working with ODOC to finalize the protocol [for nitrogen hypoxia] to make sure it complies with Eighth Amendment structures."

53.     Governor Stitt, then Attorney General Hunter, and ODOC then-Acting Director Crow also announced that the ODOC had made "minor changes" to the Execution Protocol and issued a new version effective February 20, 2020.

54.     At a February 13, 2020, press conference, then Attorney General Hunter noted that "additional training for members of the execution team will also be provided," and the goal of the updated Protocol was "to ensure that what has happened in the past won't happen again." ODOC Director Crow explained that "training" and "checks and balances" are necessary for "accountability"; "to make sure that we are, in fact, carrying every piece of [the Protocol] out meticulously"; "to make sure that each of the requirements in the protocol is done exactly in accordance with the way that it's specified"; and so that the procedures are strictly and diligently followed "to make sure that there are no mistakes."

55.     The updated Execution Protocol provides three alternative methods of execution by lethal injection. Those alternatives are set forth in "Chemical Charts" A, B, and D of Attachment D to the Execution Protocol.

        a.     "Chart A" provides for a "One (1) Drug Protocol with Pentobarbital," which calls for a 5 gram dose of pentobarbital.

b.      "Chart B" provides for a "One (1) Drug Protocol with Sodium Pentothal," which calls for a 5 gram dose of sodium pentothal.

c.      "Chart C" is "reserved" as a placeholder, but Defendants have no plans to amend the Execution Protocol to add any new, undisclosed execution methods, and no amendments will be made to the Execution Protocol (including Attachment D) without complete and timely notice.

d.      "Chart D" provides for a "Three (3) Drug Protocol with Midazolam, Vecuronium Bromide and Potassium Chloride," which calls for a 500 milligram dose of midazolam, followed by a 100 milligram dose of vecuronium bromide, followed by a 240-milliequivalents dose of potassium chloride.

56.     Section V of the Execution Protocol states that the "agency will establish protocols and training to enable staff to function in a safe, effective and professional manner before, during and after an execution." On June 5, 2020, ODOC provided Plaintiff with what appears to be the curriculum for an 8-hour training session for the Command, H-Unit and IV teams. These materials do not satisfy the requirements for execution team training required by the Execution Protocol.

### 1.      Issues With Midazolam

#### a)      Midazolam Will Not Render Plaintiff Unconscious And Insensate To Pain and Suffering

57.     The intended purpose of midazolam, the first drug in Oklahoma's three- drug protocol, is to anesthetize the prisoner, rendering him or her unconscious and insensate to pain and suffering throughout the execution procedure.

58.     Midazolam is physically and pharmacologically incapable of inducing general anesthesia, regardless of how large the dose of the drug administered.

59.     Midazolam is a short-acting benzodiazepine, not a barbiturate. Benzodiazepines are a class of drugs used primarily for treating anxiety. Midazolam is a central nervous system depressant that produces sedative, hypnotic, muscle relaxant, anxiety inhibitory, and anticonvulsant effects. Midazolam has no analgesic (pain- relieving) properties, and studies have shown that midazolam actually increases the perception of pain. Midazolam is typically administered prior to the administration of an anesthetic; midazolam itself is not used as, nor is it FDA-approved for use as, a stand- alone anesthetic.

60.     Midazolam has a "ceiling effect" (estimated at 25-40 milligrams) which prevents it from producing a level of surgical or general anesthesia. Midazolam binds with a neurotransmitter known as "GABA" to produce sedation. Because GABA is present in the brain in limited quantities, midazolam's sedative properties are limited, a phenomenon referred to as the "ceiling effect." Any dose of midazolam more than 25-40 milligrams will have no effect on the prisoner and serves no purpose. The administration of 500 milligrams of midazolam (as required by the Execution Protocol) may sedate Plaintiff, but it will not produce general anesthesia and will not render Plaintiff insensate to pain and suffering.

61.     Vecuronium bromide is a neuromuscular blocking agent that paralyzes all skeletal muscles, including the diaphragm. The intended purpose of vecuronium bromide is to paralyze the prisoner and suppress all movement. This prevents the prisoner from communicating or exhibiting any signs of consciousness or pain and suffering, including screaming, wincing, other facial expressions, or any other responsive movements or actions

indicative of pain and suffering.

62.     If a prisoner is administered vecuronium bromide without first being rendered unconscious and insensate by the first drug in Oklahoma's three-drug process, the prisoner will experience conscious asphyxiation from the paralytic. The vecuronium bromide will cause the prisoner to suffocate to death while experiencing the agonizing and conscious urge to breathe. Because the prisoner will be paralyzed by the vecuronium bromide, the prisoner will be unable to move, communicate, or exhibit any signs of suffering due to the paralysis.

63.     Potassium chloride induces cardiac arrest and is intended to cause death by stopping the prisoner's heart.

64.     If a prisoner is administered potassium chloride without first being rendered unconscious and insensate to pain and suffering by the first drug in Oklahoma's three- drug process, the prisoner will experience the excruciating feeling of being burned alive, compared to having one's veins set on fire, and the agony of cardiac arrest. Because the prisoner will be paralyzed by the vecuronium bromide, the prisoner will be unable to move, communicate, or exhibit any signs of suffering due to the paralysis.

65.     Removing the paralytic from Oklahoma's three-drug protocol will allow the prisoner to communicate or alert the execution team to any pain and suffering experienced during the execution process.

66.     Because midazolam will not induce or maintain anesthesia throughout an execution and will not render the prisoner unconscious and insensate to pain and suffering, the prisoner will experience excruciating physical and psychological pain and suffering as a result of the administration of the midazolam and from the effects of vecuronium bromide and

potassium chloride. Use of midazolam as the first drug in Oklahoma's three-drug protocol therefore poses an objectively intolerable risk of substantial harm that is sure or very likely to occur.

67.     Witness reports from executions that included midazolam confirm that prisoners were not rendered insensate by the drug and therefore experienced the excruciating pain and suffering caused by the administration of subsequent drugs in the three-drug execution procedure.

a.     On January 16, 2014, the State of Ohio executed Dennis McGuire using 10 milligrams of midazolam and 40 milligrams of hydromorphone. Witnesses to Mr. McGuire's execution reported that he struggled and gasped loudly for air "like a fish lying along the shore puffing for that one gasp of air that would allow it to breathe." Lawrence Hummer, I Witnessed Ohio's Execution of Dennis McGuire. What I Saw Was Inhumane, THE GUARDIAN, Jan. 22, 2014.

b.     In January 2014, the State of Florida executed Paul Howell using a three-drug protocol: midazolam, vecuronium bromide, and potassium chloride. *In re Ohio Execution Protocol Litig.*, 235 F. Supp. 3d 892, 906 (S.D. Ohio 2017), vacated by 860 F.3d 881 (6th Cir. 2017). A witness observed Mr. Howell open his eyes after the State had performed its consciousness check. Id.

c.     On July 23, 2014, the State of Arizona executed Joseph Wood using a combination of 750 milligrams of both midazolam and hydromorphone. For over an hour and a half, Mr. Wood "gulped like a fish on land . . . more than 640" times. *See* Michael Kiefer, Reporter describes Arizona execution: 2 hours, 640 gasps, ARIZ. REPUBLIC, July 24, 2014.

      d.     On December 8, 2016, the State of Alabama executed Ronald Bert Smith using 500 milligrams of midazolam followed by 600 milligrams of rocuronium bromide and 240 milliequivalents of potassium chloride. During the execution, Mr. Smith "was apparently struggling for breath as he heaved and coughed for about 13 minutes." Mark Berman & Robert Barnes, After Divided Supreme Court Allows Alabama Execution, Inmate Heaves and Coughs During Lethal Injection, WASH. POST, Dec. 9, 2016, available at http://wapo.st/2hnRs7p.

      e.     On April 24, 2017, the State of Arkansas executed Marcel Williams using 500 milligrams of midazolam, 100 milligrams of vecuronium bromide, and 240 milliequivalents of potassium chloride. Mr. Williams closed his eyes at 10:17 p.m. and was breathing heavily with his chest rising in hard, almost jerky motions. At 10:19, heavy breathing and movement continued. The executioner spoke into Mr. Williams's ear at 10:22 and his head turned; he was still breathing heavily. At points during the execution, his breathing was so heavy that a media witness saw his back arch off the gurney. Jacob Rosenberg, Arkansas Executions: I Was Watching Him Breathe Heavily and Arch His Back, The Guardian, Apr. 25, 2017, available at https://bit.ly/2pekMhK. He continued to breathe hard until 10:23, and coughed at 10:25. Mr. Williams's right eye opened at 10:28, continued to move at 10:29, and the eye was still open at 10:31.

      f.     On April 24, 2017, the State of Arkansas executed Jack Jones using 500 milligrams of midazolam, 100 milligrams of vecuronium bromide, and 240 milliequivalents of potassium chloride. During Mr. Jones' execution, his lips moved for about a minute after he completed his final words. Five minutes into the execution, his lips moved an additional three to five times. See Andrew DeMillo, Contrasting Accounts of Arkansas Executions from

23

Witnesses, AP, Apr. 25, 2017, available at https://bit.ly/2J5yCMf.

    g. On April 27, 2017, the State of Arkansas executed Kenneth Williams using 500 milligrams of midazolam, 100 milligrams of vecuronium bromide, and 240 milliequivalents of potassium chloride. During his execution, Mr. Williams began bucking against the restraints so hard that it caused bruising to his head. One witness said Mr. Williams "lurche[d] forward 15 times in quick succession, then another five times at a slower rate." Other witnesses described the movement as "lurching, jerking, convulsing, and coughing," which was heard by witnesses on the other side of the glass. One witness described his chest pumping for about four minutes. Timeline of Latest Arkansas Execution from AP Reporter, Apr. 28, 2017, available at https://bit.ly/2xo5i2e. One witness described hearing a sigh through the glass without the microphone on in what sounded like an expression of pain. A media witness described it as "disturbing." https://www.nbcnews.com/storyline/lethal-injection/arkansas-executes-kenneth-williams-4th-lethal-injection-week-n752086.

### b) Midazolam Causes Flash Pulmonary Edema

68. Midazolam has an acidic low pH, significantly lower than normal blood pH.  As a result of that low pH level, injection of a large dose of midazolam, including the 500 milligram dose provided in the Execution Protocol, will cause "flash" or non- cardiogenic pulmonary edema in the vast majority of, if not all, executions carried out pursuant to the Execution Protocol.

69. Flash pulmonary edema results from direct toxic/caustic damage to the small blood vessels in the lungs (alveolar capillaries) which causes immediate leakage of fluid through the damaged capillaries into the lungs. ("Flash" or non-cardiogenic pulmonary edema

is distinguished from cardiogenic pulmonary edema which occurs more gradually when fluid backs up in the lungs as a result of heart failure.)

70.    Flash pulmonary edema produces foam or froth in the airways of the lung (bronchi and trachea) resulting from the mixture of air, edema fluid and pulmonary surfactant (a detergent-like secretion normally present in the airspaces). As a result, flash pulmonary edema causes obstruction or partial obstruction of the upper airway, thus greatly increasing the work of breathing, such that the chest muscles and diaphragm strain as they expend greater effort to try to move air into the lungs.

71.    Pulmonary edema prior to the loss of consciousness produces excruciating feelings and sensations similar to drowning and asphyxiation as fluid occupies a greater volume of the air spaces in the lungs. The experience of pulmonary edema in a prisoner who is still sensate will result in extreme pain, terror and panic. For Plaintiff, those feelings will be heightened by being restrained in a prone position.

72.    Autopsies performed on prisoners who were executed with midazolam confirm that acute pulmonary edema occurs in virtually every instance, revealing signs of heavy, congested lungs and bloody froth in the lungs and upper airways. Witness reports of midazolam executions support the autopsy findings, demonstrating that prisoners who were executed with midazolam were sensate and continued to breathe after the onset of the edema, and experienced burning sensations, labored breathing, gasping, and other signs of severe pain and respiratory distress.

73.    Flash pulmonary edema will occur immediately after administration of a large dose of midazolam. Because midazolam has no analgesic properties, and will not render

prisoners unconscious and insensate to pain and suffering, prisoners executed pursuant to the Execution Protocol will continue to be conscious and sensate and continue to breathe after flash pulmonary edema occurs. As a result, there is a virtual medical certainty that the pulmonary edema caused by the administration of midazolam will cause Plaintiff to experience excruciating suffering, including sensations of drowning and suffocation.

74.     Accordingly, midazolam will not only fail to protect Plaintiff from experiencing the excruciating pain and needless suffering caused by administration of the second and third drugs in Oklahoma's three-drug execution process, but also independently and separately cause Plaintiff to experience severe pain and suffering by triggering the agonizing effects of flash pulmonary edema. The Execution Protocol thus creates a substantial, foreseeable, and avoidable risk that prisoners will suffer significant pain and suffering.

### 2.     Issues With Consciousness Checks

75.     The consciousness check is critical to confirm the prisoner has been rendered unconscious and insensate to pain and suffering prior to the administration of the paralytic and potassium chloride, and for the duration of the execution process. The Execution Protocol lacks sufficient detail and important safeguards to ensure that the execution team can competently and confidently determine whether the prisoner has been rendered and remains unconscious after the administration of midazolam and will not experience the effects of the second and third drugs.

### 3.     Issues With Compounded Drugs

76.     The Execution Protocol permits the ODOC to source drugs from a licensed compounding pharmacy and requires that a qualitative analysis of the drugs be performed

within thirty days of the execution (Execution Protocol at 40). But the Execution Protocol contains no requirement that the ODOC inform the prisoner whether the execution drugs are manufactured or compounded and no requirement that the ODOC provide the results of the qualitative analysis or the expiration date to the prisoner. In addition, ODOC has refused to disclose whether it intends to use compounded drugs.

77.    The Execution Protocol lacks sufficient detail and important requirements and safeguards to ensure that compounded drugs used in ODOC executions meet minimum standards of purity and potency. Use of contaminated, impure or sub-potent compounded drugs materially and foreseeably increases the likelihood that prisoners will suffer severe pain and serious harm during executions.

78.    Compounded drugs are not FDA-approved and are subject to less rigorous regulation and oversight relating to their identity, purity, and potency. There is a substantial risk that compounded drugs will be contaminated, handled improperly, or suffer from quality issues, the most common and concerning of which is lack of potency.

79.    Compounding drugs is a complex and highly specialized process that requires specialized equipment, numerous pharmaceutical-grade ingredients, chemical adjustments during the process, and the appropriate experience and credentials in aseptic compounding techniques.

80.    Even minor deviations from the complex procedures for compounding drugs can result in a sub-potent drug. The use of a sub-potent drug increases the risk of severe pain and suffering because it would not produce the necessary pharmacological effect, potentially leading to prolonged suffering.

81.     The Execution Protocol lacks information explaining how the drugs Defendants intend to use for executions have been or will be compounded. In particular, the Execution Protocol omits any discussion of: the quality of the Active Pharmaceutical Ingredient ("API") used to compound drugs; an appropriate formulation recipe; the procedures by which the drug has been or will be compounded; the ingredients and their concentrations; the equipment used and how that equipment is maintained and calibrated; or the contents of "compounding logs," a master worksheet that documents the criteria used to determine the beyond-use date, storage requirements, and documentation of performance of quality-control procedures. Without that information, it is impossible to verify that the drugs have been properly compounded, and are safe and effective.

82.     Proper compounding also involves standards for proper storage of drugs, including standards relating to temperature, humidity, and sterile conditions. Storage conditions must be continually monitored and documented, but the Execution Protocol contains no requirements to ensure that these critical storage requirements are met and that sub-potent drugs are not used in executions. Improper storage, such as excessive temperature, excessive humidity, or unsterile conditions, will cause drugs – both the API and the compounded form – to become degraded, contaminated, or damaged, increasing the risk that the drugs will lose potency and not have the required pharmacological effect. The Execution Protocol provides no mechanism to ensure that critical storage standards are met and will not result in sub-potent or otherwise tainted drugs.

83.     Compounded drugs are assigned a shelf-life or "beyond use date," which set forth the allowable time between compounding and administration. The "beyond-use date" of a

compounded drug indicates the window of time when the drug remains stable, sterile, and potent. Using a compounded drug after its "beyond use date" creates a substantial risk that the drug will be unstable, unsterile, or sub-potent. The Execution Protocol contains no safeguards or guidelines to ensure drugs will be assigned an appropriate "beyond use date" and will not be used after such date has passed.

84.     If Defendants carry out executions using compounded drugs, there is a significant and foreseeable risk that the drugs will be handled improperly, contaminated, sub-potent, and/or expired, creating a substantial risk of serious harm to Plaintiff.

### 4.     Issues With Training

85.     As the Supreme Court has noted, thorough training of execution team members is crucial to ensure executions are carried out properly and without threat to a prisoner's protected rights. *See Baze v. Rees*, 553 U.S. 35, 55 (2008).

86.     Without complete and proper training protocols, individuals participating in executions will be unable "to function in a safe, effective and professional manner before, during and after an execution" as required by the Execution Protocol.

87.     The botched executions of Messrs. Lockett and Warner and the aborted execution of Mr. Glossip were caused, in large part, by human error and lack of adequate training and safeguards.

88.     In its Interim Report, the Grand Jury found that: "training lacked key components"; the execution of Mr. Warner was not "in compliance with the Department's Protocol" (id. at 74); "the Execution Protocol lacked controls to ensure that the proper execution drugs were obtained and administered" (id. at 74-75); "there was an inexcusable

29

failure to act on the part of a few individuals" (id. at 75); "most Department employees profoundly misunderstood the Protocol" (id. at 105); training failed to ensure that all participants gained "intimate knowledge of the policies and protocols surrounding an execution" (id.); "[t]he IV team's training . . . did not include scenario-based trainings filling the syringes from drug vials" (id. at 16); and the IV team had not received a copy of the June 2015 protocol (id).

89.     Based on its investigation and findings, the Grand Jury recommended that the State "thoroughly train[]" any individuals participating in executions regarding the details and requirements of the protocol. *Id*. at 101-06.

90.     The Commission also concluded that inadequate training needed to be corrected, and made several recommendations, including that: "[a]ll government personnel involved in carrying out an execution . . . should be thoroughly trained and evaluated on all relevant aspects of the Oklahoma Department of Corrections' execution protocol"; "the ODOC director should ensure and certify in writing to the governor that all individuals involved in the ODOC execution protocol are adequately trained and prepared"; and training requires "something more than repeated dry-runs and walk- throughs. Each person involved in the IV team and Special Operations Team should know the Protocol, the drugs to be used, and the order in which they are to be administered."

91.     The Department of Public Safety concluded that a contributing factor to the botched execution of Mr. Lockett was "limited provisions for contingencies," and included a number of recommendations for contingency plans, most of which were incorporated into the Execution Protocol as the list of "scenarios" some team members must train to address. DPS

Report at 22. The DPS Report also recommended that "DOC should establish formal and continual training programs." *Id*. at 28.

92.     The Execution Protocol requires execution team members to participate in trainings within specific timeframes that cover specific topics.In  addition,  the  Execution Protocol, Section V, states that the "agency will establish protocols and training to enable staff to function in a safe, effective and professional manner before, during and after an execution." Execution Protocol, at 9. However, the Execution Protocol does not include or identify the training protocols and/or programs that satisfy its own requirements that ODOC "staff be trained "to function in a safe, effective and professional manner before, during and after an execution." *Id*. at 9. The omission of the training materials component renders the Execution Protocol materially incomplete on its own terms, and creates a substantial risk that inadequately trained execution team members will bungle additional executions.

93.     Even where the Execution Protocol provides information about training, it is unclear and incomplete, omitting details that would provide for more consistent and effective training.

        a.     The Execution Protocol requires the agency director to establish a training schedule for periodic, on-sight practice by the H-Unit Team (Restraint Team and Special Operations Team) to include 10 training scenarios in the twelve months preceding an execution. Id. at 9. It is unclear how many different training sessions this actually requires the H-Unit Team to participate in or whether all 10 scenarios can be completed in a single training session. The Execution Protocol requires training "scenarios" to include five contingencies: Issues with equipment and supplies; issues with IV access; issues if the prisoner is not unconscious;

unanticipated medical or other issues; and issues related to order, security, and the facility. *Id*. at V.A. However, it lacks sufficient details to identify whether these requirements apply to the IV team (or any of the other teams), or how the team will be evaluated. Id.

      b.    The Execution Protocol also requires the H-Unit Section Teams to "initiate training sessions no less than once per week until the scheduled date of execution beginning 35 days prior to the execution date." Id. It is unclear if these trainings are separate from the 10 scenarios the team is required to "practice" within the 12 months leading up to an execution or additional trainings that the team is required to attend. The Execution Protocol also does not indicate what these weekly trainings should encompass or how personnel will be evaluated.

      c.    The Execution Protocol provides that the IV team, which is responsible for the most crucial parts of the execution process, must participate in only two trainings with the members of the H-Unit Section Team to include "multiple scenarios" within seven days of the schedule execution. Id. at V.C. The Grand Jury emphasized the importance of these two teams training together because of the coordination required during the execution, yet the Execution Protocol requires the teams to train together only two times before an execution. Additionally, it is unclear what "multiple scenarios" requires and if it will ensure these teams are prepared to work together during an execution, particularly if problems arise.

      d.    The personnel on the other execution teams (Witness Escort, Maintenance Response, Critical Incident Management, Traffic Control, Victim Services) are required only to attend training within seven days of the execution. Id. at V.D.

    94.    On June 5, 2020, ODOC produced documents relating to a one-day training to be

conducted by the Special Operations Team Leader for members of the Command, H-Unit and IV teams. The documents consist of a Lesson Plan Cover Sheet, the outline of an Instructional Lecture, a Power Point presentation, and a twenty-question written assessment. "Execution of Offenders Sentenced to Death," Protocol OP-040301 (OAG – 015650 – OAG - 015722). However, the one-day training specified in the documents does not satisfy any of the training requirements stated in the Execution Protocol. The Execution Team requires the H-Unit teams and the IV teams to participate in multiple training sessions and requires teams to "practice" different scenarios related to five areas of contingency planning. These training documents provide for a single day of training, do not include any "practice," and do not address any of the areas of contingency planning identified in the Execution Protocol. Additionally, personnel on the other execution teams (Witness Escort, Maintenance Response, Critical Incident Management, Traffic Control, Victim Services) who are required to attend training in the week before the execution do not attend this training.

### 5.  Issues With IV Access and Maintenance

95.  The Execution Protocol provides that the execution drugs will be administered through an IV catheter. Setting an intravenous line is a delicate, complicated, and invasive procedure that requires appropriate and extensive training, skill, and experience. Ensuring that intravenous access is properly established, functioning, maintained, and monitored is essential and required to ensure lethal injection will effectively bring about death in a humane and constitutional manner.

96.  Proper establishment and maintenance of the IV catheter throughout the execution is necessary to ensure that drugs are properly and humanely administered to the

33

prisoner.

97.     Improper IV insertion may lead to infiltration (a situation in which the drug is injected into the surrounding tissue instead of the vein), extravasation (leakage of the drug into the surrounding tissue), or arterial injection (when the drug is injected into the artery instead of the vein and drugs travel away from the heart and towards the extremities). Extravasation and infiltration cause instant excruciating pain likened to being set on fire. Infiltration, extravasation and arterial injection can result in slow suffocation, a lingering and extremely painful death, and/or failure of the execution altogether.

98.     The Execution Protocol lacks sufficient detail and necessary safeguards to ensure that IV access is properly established and maintained throughout the execution.

        a.      The Execution Protocol contains confusing and incomplete information about setting IVs, selecting IV sites, maintaining IV sites, changing to an alternate site in the event of a problem, and ensuring that IV sites are functioning properly. Execution Protocol at VII.F.6-8. Additionally, the Execution Protocol provides no guidance and lacks necessary safeguards regarding which alternative IV sites may be considered in the event the IV team is not able to establish IVs at the preferred sites. The Execution Protocol does not provide guidance on which IV sites can and cannot be considered, the basis for selecting alternative sites, or a preferential order for assessing the feasibility of alternative sites.

        b.      The Execution Protocol contains conflicting guidance on the amount of time the IV team has to set the IVs and the authority of the Director to halt the execution. This lack of clarity is likely to increase pressure on the IV team. The Execution Protocol states that "[t]he IV team shall be allowed as much time as is necessary to establish a viable IV site(s)."

Id. at VII.F.6.e. But if the IV team cannot establish IVs, the Execution Protocol requires that they tell the Director, who will "determine whether to request a postponement of the execution" (id. at VII.F.6.f), and determine "whether or how long to continue efforts to establish viable IV sites(s)." Id. at VII.F.6.g.   Despite the Director's ability to "determine" whether to postpone the execution, the Director is also required to "contact the governor or designee to advise of the status and potentially request a postponement of the execution" after one hour of IV attempts. Id. at VII.F.6.h.

c.      The Execution Protocol fails to identify and address problems that can prevent the full delivery of the drugs, including by a dislodged or partially dislodged catheter, leaks in the tubing, or syringe errors.

d.      The Execution Protocol contains no specific requirements for the qualifications, training, or experience of the IV team Leader. The IV team Leader has significant responsibilities during an execution, including advising the Director on where to site the IVs (id. at VII.F.6.b), determining whether it is necessary to use an alternate IV site (id. at VII.F.8.b), supervising the Special Operations Team (id. at VII.F.6), and acting as point person if something goes wrong during an execution (id. at VII.F.3.c). The Execution Protocol contains no requirements or safeguards to ensure that the IV team leader is competent to perform these duties, let alone to supervise others responsible for setting and maintaining IVs and administering drugs intravenously.

e.      The Execution Protocol also does not specify a number (or even a range) of IV team members. By the terms of the Protocol, the IV team could be comprised of just the leader, who could have no relevant skills. If the team has additional members, the Execution

Protocol does not require that they routinely set and maintain IVs for drug administration.

f.      The Execution Protocol lacks criteria for selection of members to the Special Operations Team, which is responsible for administering the drugs, verifying the "identity, concentration and quantity" of the drugs, and assisting with "preparing each chemical and corresponding syringe under the supervision of the IV team leader" (id. at Attachment D at 1 & 4; & IV.B.2.b), thus allowing the Special Operations Team to be comprised of individuals who lack medical training.

### 6.      Issues Concerning Documentation and Drug Verification

99.     Documentation is essential to transparency and proper oversight. Without a requirement that the execution team document its activities accurately in real time, and in the absence of a mechanism to provide relevant documentation and execution logs to counsel for prisoners and to an independent evaluator, there is no way to determine if execution personnel are complying with the Execution Protocol. The Execution Protocol fails to require adequate documentation of the execution process in order to verify that execution personnel are in compliance with, and track the required steps of, the Execution Protocol and that the actual steps taken during an execution are correctly recorded and memorialized.

100.    Documentation of drug verification is essential to ensuring that executions are administered utilizing the correct drugs. The Commission recommended that the prisoner be provided written notice of the drugs to be used at least 20 days in advance, including information regarding the name, safety and efficacy of the drugs, whether they are manufactured or compounded, and quality assurance testing results. Commission Report at 198. However, contrary to this recommendation, the Execution Protocol does not require that

drug purchases be recorded in writing and provides the prisoner with only 10-days' notice of the drug selection. Additionally, the Execution Protocol permits the ODOC to source drugs from a licensed compounding pharmacy and requires that a qualitative analysis of the drugs be performed within thirty days of the execution, but it does not require the ODOC to ever inform the prisoner whether the drugs are manufactured or compounded, or provide any information about the safety and efficacy of the drugs. No quantitative analysis to ascertain the potency or amount of active pharmaceutical ingredient in the compounded formulation is required.

101.    The Execution Protocol requires a Quality Assurance Review, in which the agency director or designee must review "documentation" to "ensure compliance with the written procedure directive" and the Chief of Staff must prepare a "report" with "appropriate suggestions or recommendations, as needed." Execution Protocol at VIII.A and D. However, because the Execution Protocol does not make clear what documents must be maintained, it is not clear what documentation is subject to the Quality Assurance Review.

102.    The Execution Protocol lacks safeguards to ensure that what actually occurs during an execution is properly and thoroughly memorialized. Specifically,    the    Execution Protocol includes a checklist (referred to in the Execution Protocol as a "log"), but does not ensure personnel will record any unexpected events and/or the details of how personnel addressed those events.

### 7.    Issues With Transparency, Oversight, and Review

103.    The Execution Protocol lacks requirements to ensure that ODOC acts with transparency so that there can be an independent and thorough review and oversight of ODOC's performance in carrying out executions.

37

a.      The Grand Jury recommended that an independent third party, bound by confidentiality, be responsible for conducting the post-execution Quality Assurance Review. Interim Report at 104; Commission Report at 198. The Grand Jury based its recommendation on the finding that the previous Quality Assurance Review lacked "specificity" and that the personnel charged with conducting the review "had no specialized training in conducting quality assurance reviews of executions. Interim Report at 92. The Grand Jury found the Quality Assurance Review "amounted to little more than a cursory review in a process requiring greater oversight." *Id.* at 93. The Grand Jury also recommended an ombudsman be available to execution team members on-site during executions, who may need anonymity to feel comfortable raising concerns. *Id.* at 105.

b.      The Death Penalty Review Commission recommended a pre- execution review by an independent third party "before an irreversible error can occur." Commission Report at 198. This review would require the Director to provide certification to the Governor 48 hours in advance of an execution that all aspects of the Execution Protocol have been followed up to that point and would include certification that all personnel have been adequately trained, that the correct drugs are in the possession of the ODOC and that all necessary equipment and facilities are available and ready. Id. The Commission recommended that all findings from this review be communicated to the ODOC, the Legislature, the Governor's office and the public.

c.      Contrary to the recommendations of the Grand Jury and the Commission, the Execution Protocol provides that a post-execution Quality Assurance Review will be conducted by personnel within the agency and not by an independent third party. Review by an

38

independent third party would provide a layer of external oversight and accountability to assess whether ODOC is complying with the written terms of the Execution Protocol and addressing any issues that arise in a competent manner.

        d.     The Execution Protocol does not require ODOC to provide information to counsel or anyone outside the agency regarding the agency's readiness to conduct an execution or its compliance with the Execution Protocol's preparatory steps in advance of an execution.

        e.     The Execution Protocol does not require the ODOC to disclose in advance of an execution information related to the prisoner's medical assessment, information about whether the drugs are manufactured or compounded, and/or confirmation that the execution teams have conducted all the necessary trainings and that proper drugs and equipment are on-hand.

### 8.    Issues With Access to Counsel

104.   The Execution Protocol lacks requirements to protect Plaintiff's constitutional right to counsel throughout the procedure.

        a.     The Execution Protocol contains no requirement that the results of the pre-execution assessment of the prisoner's medical and mental health condition, including concerns related to establishing or maintaining IVs are provided to counsel. Execution Protocol at VII.B.a.(3)-(5).

        b.     The Execution Protocol contains no requirement that any of the pre-execution readiness information be provided to the prisoner or counsel. Without this information, the prisoner has no opportunity to challenge the ODOC's lack of compliance with pre-execution aspects of the Execution Protocol.

c.      The Execution Protocol terminates the prisoner's access to his counsel two hours prior to the execution or "earlier if necessary" (id. at VII.E.d), preventing counsel from observing the setting of the IVs and any issues or problems with IV access. *Id*. at VII.F.6.a-i. Counsel is effectively prevented from taking any action to challenge failure to comply with the Execution Protocol, or to challenge problems relating to IV failures.

d.      The Execution Protocol allows the Director to order that the curtains to the witness viewing room be closed and that witnesses be removed (id. at Attachment D, at 7), denying counsel access to information regarding the condition of their client and preventing attorneys and other witnesses from observing what happens to the prisoner if things go awry (as occurred in the botched execution of Mr. Lockett) and how the execution team addressed the problems. The Execution Protocol's provisions concerning witnesses do not indicate whether attorneys are permitted to have materials to take notes or have access to a phone, or the ability to contact outside counsel or the court. *Id*. at VI.C.4 .

### 9.      The Execution Protocol Is Illusory

105.   The Execution Protocol provides that "[t]hese procedures shall be followed as written unless deviation or adjustment is required, as determined by the agency director or, in the event of an absence, their designee." Execution Protocol at 1. The Director thus has unfettered discretion to modify the Execution Protocol any time s/he determines it is "required."

106.   That discretion applies even to the drug formula. The Execution Protocol states: "The director shall have the sole discretion as to which chemicals shall be used for the scheduled execution. This decision shall be provided to the inmate in writing ten (10) calendar days prior to the scheduled execution date." Execution Protocol, Attachment D, at 4.

40

107.    In addition, the Execution Protocol lists three different drug protocols in Attachment D, but does not specifically require the Director to choose one of the three, leaving open the possibility of any drug formula, so long as the notice requirement is met and/or the change is approved in writing by the Director.

108.    There is no legitimate penological justification for the Director to retain unchecked discretion to change the Execution Protocol at any time. Nor is there any penological justification to have an Execution Protocol that purports to set out a procedure for executions, but that expressly states it can be withdrawn, modified, or replaced at any time and that purports to create no rights or obligations.

### F.    Alternatives to Oklahoma's Three Drug Protocol

109.    The United States Supreme Court has held that to establish an Eighth Amendment violation, "a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019).

110.    Plaintiff cannot be required to plead or prove an alternative method of execution because such a requirement is a substantial burden on his sincerely held religious beliefs, does not further a compelling governmental interest, and is not the least restrictive means for the government to accomplish its stated interest.

111.    Plaintiff's deeply held Christian religious beliefs forbid committing suicide. Just as Plaintiff avers that he did not commit the murder of which he was convicted, and understands that the day might come where he will be required to acquiesce passively in being put to death,

41

he cannot reconcile active complicity in his own death with his belief in the sanctity of life and life itself being a gift from God.

112.    Subject to the foregoing, solely for purposes of this pleading, based on statutory authority and current and historical practices, and upon information and belief, counsel alleges on behalf of Plaintiff (who reserves the right following consultation with counsel to object to any proffered alternative), the following alternative methods of execution are feasible, available, readily implemented and would significantly reduce a substantial risk of severe pain. Defendants have refused, without a penological reason, to adopt any of these alternatives.

    a.    Execution by a single dose of FDA-approved pentobarbital or sodium pentothal (thiopental) as provided by Charts A and B of the Execution Protocol, each of which is, upon information and belief, accessible to ODOC, including implementing the remedial measures and safeguards detailed below and adding a pre-dose of an analgesic, anesthetic drug in a sufficiently large clinical dose. There are a wide variety of well-known, accessible, and easily administered pain-relieving medications used in anesthetic procedures. The opioid fentanyl is one drug that is accessible to ODOC and that would substantially reduce the risk that the prisoner would remain sensate to pain. The necessary remedial measures and safeguards are as follows:

        i.    the selection of qualified, competent and vetted team members, whose qualifications are disclosed;

        ii.    establishment of two patent, functioning peripheral IV lines and assurance (a) that no central line will be placed unless it is determined to be necessary following a vein assessment by a qualified medical professional, and (b) central lines will be set only by qualified and competent medical professionals; and

iii.    the administration of FDA-approved pentobarbital or thiopental in close proximity to the prisoner, rather than remotely.  Eliminating the need for extension sets of IV tubing significantly would reduce the risks of leakage and pinching of the tubing. Proximate administration would also ensure adequate surveillance and monitoring of the IV, the catheter site and the prisoner. By eliminating the need for lengthy IV tubing, proximate administration would greatly reduce the variation and risk introduced by the increased contact, and subsequent resistance, between the drug and the walls of the tubing. Any concern about revealing the identity of personnel participating in the execution process could be satisfactorily addressed by using face and hair coverings or a privacy screen.

b.    Execution by a single dose of compounded pentobarbital or sodium pentothal (thiopental) that complies with all state and federal compounding requirements, and has been tested for purity and potency, with records of testing, chain of custody and compounding formula disclosed to prisoners and their counsel, including a pre-dose of an analgesic, anesthetic drug in a sufficiently large clinical dose, and implementing the remedial measures and safeguards set forth in paragraph 114(a)(i)-(iii) above.

c.    Execution by a single dose of 40 milligrams of FDA-approved midazolam and potassium chloride, including implementing the remedial measures and safeguards set forth in paragraph 114(a)(i)-(iii) above and adding a pre-dose of a pain-relieving, anesthetic drug in a sufficiently large clinical dose. If the prisoner is deemed unconscious and insensate to pain and suffering, removing the paralytic will allow the prisoner to communicate any pain and suffering he/she experiences during administration of the potassium chloride.

d.    Execution by firing squad. Execution by firing squad is currently authorized by Oklahoma and the laws of two other states (Utah and Mississippi). Defendants have the means and ability to administer executions by firing squad. Execution by firing squad eliminates entirely the risk of pain and suffering inherent in executions using midazolam, a

43

paralytic, and potassium chloride according to the procedures set forth in the Execution Protocol, including risks associated with establishing IV access and addressing a prisoner's unique physical, health and medical conditions. Execution by firing squad causes a faster and less painful death than execution by lethal injection. *See Arthur v. Dunn*, 137 S. Ct. 725, 733-34 (2017) (Sotomayor, J., dissenting) (citing reports and stating that a firing squad may cause nearly instantaneous death, be comparatively painless, and have a lower chance of a botched execution); *see also Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring) (addressing the availability of firing squad as an alternative). Execution by firing squad also "is significantly more reliable" than lethal injection. *Glossip v. Gross*, 135 S. Ct. 2726, 2796 (2015) (Sotomayor, J., dissenting). Recent studies have confirmed that execution by firing squad statistically is much less likely to result in "botched" executions than lethal injection. See Austin Sarat, Gruesome Spectacles: Botched Executions and America's Death Penalty (2014).

### G.     Evolution of Eighth Amendment as it Relates to Plaintiff

113.     The evolution of death penalty jurisprudence has reflected a narrowing applicability as the judiciary and society recognize that few situations call for the imposition of the death penalty as to what qualifies without being cruel and unusual punishment. *Trop v. Dulles,* 356 U.S. 86 (1986). The Eighth Amendment's meaning contained an "evolving standard of decency that marked the progress of a maturing society."  Concurrent with the recognition that persons not guilty of the crimes with which they have been convicted are at times put to death, and later found to be innocent, is the broadly held belief that only those cases wherein there is "absolute certainty" a defendant committed said murder should the death penalty be allowed. A brief timeline of the evolution of what is "cruel and unusual punishment"

in our maturing society is below:

a.  1968 - *Witherspoon v. Illinois*, 391 U.S. 510 (1968). Dismissing potential jurors solely because they express opposition to the death penalty held unconstitutional.

b.  June 1972 - *Furman v. Georgia*, 408 U.S. 238 (1972). Supreme Court effectively voids 40 death penalty statutes and suspends the death penalty.

c.  1976 - *Gregg v. Georgia*,428 U.S. 153 (1976). Guided discretion statutes approved. Death penalty reinstated but only where the state statute guides the sentencing in a way as to not be arbitrarily or discriminatorily applied.

d.  1977 - *Coker v. Georgia,* 433 U.S. 584 (1977). Held death penalty is an unconstitutional punishment for rape of an adult woman when the victim is not killed.

e.  1986 - *Ford v. Wainwright*, 477 U.S. 399 (1986). Execution of insane persons banned.

f.  1988 - *Thompson v. Oklahoma*, 487 U.S. 815 (1988). Executions of offenders age fifteen and younger at the time of their crimes is unconstitutional.

g.  November 1998 - Northwestern University holds the first-ever National Conference on Wrongful Convictions and the Death Penalty. The Conference brings together 30 inmates who were freed from death row because of innocence.

h.  2002 - *Ring v. Arizona*, 536 U.S. 584 (2002). A death sentence where the

necessary aggravating factors are determined by a judge violates a
defendant's constitutional right to a trial by jury.

i.    2002 - *Atkins v. Virginia*, 536 U.S. 304 (2002). the execution of "mentally
retarded" defendants violates the Eighth Amendment's ban on cruel and
unusual punishment.

j.    March 2005 - *In Roper V. Simmons*, 543 U.S. 551 (2005). the United
States Supreme Court ruled that the death penalty for those who had
committed their crimes under 18 years of age was cruel and unusual
punishment.

k.    June 2008 - *Kennedy v. Louisiana*, 554 U.S. 407 (2008). Capital
punishment cannot apply to those convicted of child rape where no death
occurs.

114.    The evolving standards of decency in America now require a higher degree of
certainty of guilt for defendants the state wishes to seek the death penalty against.

115.    The current protocol proffered by the state contains no such provision.

116.    A June 2, 2021, report states that 78% of Americans believe there is a risk of
innocent people being put to death in America.

117.    Adam Luck, Board Chairman of the Oklahoma Pardon and Parole Board, stated
that "Personally, I believe in death penalty cases there should be no doubts."

118.    Kenneth W. Starr, a former federal judge and U.S. Solicitor General, who
represented Virginia death row inmate Robin Lovitt before the U.S. Court of Appeals for the
4th Circuit. Though he supports capital punishment, Starr stated that "the death penalty has to

be administered with the utmost caution and reserved for the gravest offenses. This is not that kind of case. Robin Lovitt maintains his innocence, and evidence that might prove his innocence has been destroyed. I'm very distressed by that…. Society had better be absolutely certain before they put someone to death who is maintaining his innocence. I feel very passionately about that."

119.   Since 1973, over 156 people have been released from death rows in 26 states because of innocence.   Nationally, at least one person is exonerated for every 10 that are executed.   From ACLU.ORG.

120.   The findings and conclusions of the Commission (Oklahoma Death Penalty Review Commission referenced above) underscore why not just special circumstances need be established to impose the death penalty, but also a higher level of certainty than is accorded other criminal trials.

121.   "Many of the findings of the Commission's year-long investigation were disturbing and led Commission members to question whether the death penalty can be administered in a way that ensures no innocent person is put to death." (Commission Report vii)."

122.   "Commission members agreed that, at a minimum, those who are sentenced to death should receive this sentence only after a fair and impartial process that ensures they deserve the ultimate penalty of death. To be sure, the United States Supreme Court has emphasized that the death penalty should be applied only to "'the worst of the worst.'" (Commission Report vii)

123.   The Commission further acknowledged that "it is undeniable that innocent

people have been sentenced to death in Oklahoma." (Commission Report vii)

124.   Acknowledging the severe consequences of persons "known" to be innocent having been put to death in Oklahoma (no fewer than ten), and the consequences of state action killing innocent persons, the Commission furthermore expressed concerns as to whether "the death penalty in our state can be implemented in a way that **eliminates the unacceptable risk** of executing the innocent, as well as the unacceptable risks of inconsistent, discriminatory, and inhumane application of the death penalty." Commission Report viii(emphasis added).

125.   The Commission furthermore urged "the Oklahoma Legislature, executive branch, and judiciary to take actions to address the systemic flaws in Oklahoma's death penalty system," to adhere faithfully to important Oklahoma values and aspirations of innocence protection, procedural fairness, and justice for all." Commission Report viii.

126.   Notwithstanding the Commission's recommendations, the measures implemented by the State only purport to improve the mechanics by which executions are to be performed, i.e., an improved methodology of killing; the State does not purport to have improved its methodology of ensuring that persons not guilty of the crimes for which they are sentenced to death are in fact guilty and thus should be killed through State action.

127.   Although Plaintiff was found guilty of murder by a jury under the beyond a reasonable doubt standard, the evolving standards of decency under the Eighth Amendment require a higher standard.

128.   A third stage should be implemented into the death sentence process wherein jurors, after finding proof of guilt beyond a reasonable doubt, then must find a person guilty by "absolute certainty" before moving on to consider aggravating and mitigating circumstances.

129.   There were several pieces of evidence supporting Plaintiff's innocence, many of which were not presented to the jury.

    a.   In the original police investigation, the detectives believed the story of Doug Ivens instead of Plaintiff and considered the case an "open and shut" case and, therefore, did not conduct an adequate investigation of the crime scene.

    b.   However, the physical evidence that was tested is inconsistent with Plaintiff's guilt because the perpetrator necessarily would have had significant blood spatter on her or his clothing. Joyce Gilchrest testified at the 1985 trial there was blood on Plaintiff's clothing and that theory carried over to the 2003 trial despite the fact DNA evidence obtained between the two trials disproved her testimony. Plaintiff's clothing was clean just after the shooting. Plaintiff's 2003 trial attorney failed to present this evidence at trial.

    c.   The physical evidence supports a conclusion that thirteen shots were fired on the night in question, which contradicts the state's five shot theory presented to the jury in 2003.  The fact thirteen shots were fired was stipulated to by the Oklahoma Attorney General at the Tenth Circuit during the appeal process from the 1985 trial. Plaintiff's 2003 trial counsel did not present any evidence to contradict the five shot theory despite having access to the same and a stipulation by the state thirteen shots were fired.

    d.   The cause of death was contact wounds to the head of Linda Reaves.  There was significant spatter on a wall which was beyond where the shooter would have been standing.  The shooter, being between the wall and the contact wound, would have necessarily been sprayed with large amounts of

blood.  Plaintiff had none of Ms. Reaves blood on him.

e.  Forensic pathology consultant Vincent Di Maio, M.D., noted there "would have been ejection of blood and brain tissue at the time it [the gunshot wound] was inflicted."

f.  Forensic scientist Edward Hueske noted "[t]here should be a lot of blood on the shooter and/or the surroundings."

g.  There was significant blood on surroundings but not on Plaintiff. Especially since, under the state's theory and under any plausible scenario, the shooter was between the bloody surroundings and the site of the gunshot, Plaintiff was not the shooter.

h.  To further cast doubt on Plaintiff's guilt, DNA testing on surviving victim Doug Ivens's shirt revealed partial DNA profiles which were inconsistent with Reaves, Ivens, and Stouffer.  None of the DNA testing produced results incriminating Plaintiff.  Furthermore, Plaintiff's defense counsel at trial, for some unknown reason, decided not to present any of the DNA evidence to the jury.

i.  In 2000 a man named Lloyd Lafevers confessed to being paid in drugs to murder Linda Reaves on Janury 24, 1985.

## H.    Alternatives to Oklahoma's Three Drug Protocol.

130.    The United States Supreme Court has held that to establish an Eighth Amendment violation, "a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has

refused to adopt without a legitimate penological reason." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019).

131.    Plaintiff cannot be required to plead or prove an alternative method of execution because such a requirement is a substantial burden on his sincerely held religious beliefs, does not further a compelling governmental interest, and is not the least restrictive means for the government to accomplish its stated interest.

132.    Plaintiff's' individual, deeply held Christian beliefs prohibit committing suicide. Just as Plaintiff avers that he did not commit the murder for which he was convicted, and understands that the day might come where he will be required to acquiesce passively in being put to death, he cannot reconcile active complicity in his own death with his belief in the sanctity of life and life itself being a gift from God. Thus, he cannot participate in the assistance of suicide. This is a widely accepted and fundamentally normal liturgical belief. For example, assisting in suicide and suicide itself are forbidden by Jewish law, viewed as a sin, may result in burial in a separate part of a Jewish cemetery, and may bar certain mourning rites. Assisting in suicide and suicide itself are also objectively a sin in the Roman Catholic Church, which violates the commandment "You shall not commit murder." Christian Protestants (including Evangelicals, Charismatics, Pentecostals, and other denominations) believe that suicide is self-murder, and so anyone who commits it is sinning, which may result in the unpardonable sin of the refusal of the gift of salvation. The Orthodox Church normally denies a Christian burial to a person who has committed suicide. The Church of Jesus Christ of Latter-Day Saints (LDS Church) views suicide as wrong. Virtually all Muslim scholars and clerics consider suicide forbidden, as the Quran instructs: "And do not kill yourselves, surely God is most Merciful to

you." In Buddhism, for an adherent to break out of samsara, Buddhism advocates the Noble Eightfold Path, which is contrary to participating in suicide. In Hinduism, suicide is spiritually unacceptable. Taking one's own life is considered a violation of the code of ahimsa (non-violence) and therefore equally sinful as murdering another.

133.     Pleading and proving an alternative execution method would make Plaintiff complicit in his own death in a way that is akin to suicide or assisting suicide, which is contrary to and violates his sincerely held religious beliefs.

134.     Subject to the foregoing, solely for purposes of this pleading, based on statutory authority and current and historical practices, and upon information and belief, counsel alleges on behalf of Plaintiff (who reserves the right following consultation with counsel to object to any proffered alternative), the following alternative methods of execution are feasible, available, readily implemented and would significantly reduce a substantial risk of severe pain.

a.     Execution by a single dose of FDA-approved pentobarbital or sodium pentothal (thiopental) as provided by Charts A and B of the Execution Protocol, each of which is, upon information and belief, accessible to ODOC, including implementing the remedial measures and safeguards detailed below and adding a pre-dose of an analgesic, anesthetic drug in a sufficiently large clinical dose. There are a wide variety of well-known, accessible, and easily administered pain-relieving medications used in anesthetic procedures. The opioid fentanyl is one drug that is accessible to ODOC and that would substantially reduce the risk that the prisoner would remain sensate to pain. The necessary remedial measures and safeguards are as follows:

i.     the selection of qualified, competent and vetted team members, whose

qualifications are disclosed;

ii.    establishment of two patent, functioning peripheral IV lines and assurance (a) that no central line will be placed unless it is determined to be necessary following a vein assessment by a qualified medical professional, and (b) central lines will be set only by qualified and competent medical professionals; and

iii.    the administration of FDA-approved pentobarbital or thiopental in close proximity to the prisoner, rather than remotely.   Eliminating the need for extension sets of IV tubing significantly would reduce the risks of leakage and pinching of the tubing. Proximate administration would also ensure adequate surveillance and monitoring of the IV, the catheter site and the prisoner. By eliminating the need for lengthy IV tubing, proximate administration would greatly reduce the variation and risk introduced by the increased contact, and subsequent resistance, between the drug and the walls of the tubing. Any concern about revealing the identity of personnel participating in the execution process could be satisfactorily addressed by using face and hair coverings or a privacy screen.

b.    Execution by a single dose of compounded pentobarbital or sodium pentothal (thiopental) that complies with all state and federal compounding requirements, and has been tested for purity and potency, with records of testing, chain of custody and compounding formula disclosed to prisoners and their counsel, including a pre-dose of an analgesic, anesthetic drug in a sufficiently large clinical dose, and implementing the remedial measures and safeguards set forth in paragraph 114(a)(i)-(iii) above.

c.    Execution by a single dose of 40 milligrams of FDA-approved midazolam and potassium chloride, including implementing the remedial measures and safeguards set forth in paragraph 114(a)(i)-(iii) above and adding a pre-dose of a pain-relieving, anesthetic drug in a sufficiently large clinical dose. If the prisoner is deemed unconscious and insensate to pain and suffering, removing the paralytic will allow the prisoner to communicate any pain and suffering he/she experiences during administration of the potassium chloride.

d.      Execution by firing squad. Execution by firing squad is currently authorized by Oklahoma and the laws of two other states (Utah and Mississippi). Defendants have the means and ability to administer executions by firing squad. Execution by firing squad eliminates entirely the risk of pain and suffering inherent in executions using midazolam, a paralytic, and potassium chloride according to the procedures set forth in the Execution Protocol, including risks associated with establishing IV access and addressing a prisoner's unique physical, health and medical conditions. Execution by firing squad causes a faster and less painful death than execution by lethal injection. *See Arthur v. Dunn*, 137 S. Ct. 725, 733-34 (2017) (Sotomayor, J., dissenting) (citing reports and stating that a firing squad may cause nearly instantaneous death, be comparatively painless, and have a lower chance of a botched execution); *see also Bucklew*, 139 S. Ct. at 1136 (Kavanaugh, J., concurring) (addressing the availability of firing squad as an alternative). Execution by firing squad also "is significantly more reliable" than lethal injection. *Glossip v. Gross*, 135 S. Ct. 2726, 2796 (2015) (Sotomayor, J., dissenting). Recent studies have confirmed that execution by firing squad statistically is much less likely to result in "botched" executions than lethal injection. See Austin Sarat, Gruesome Spectacles: Botched Executions and America's Death Penalty (2014).

## VI.      Claims For Relief

### Count I

### (Fifth Amendment Violation — Denial Of Due Process)

135.    Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

136.    The Due Process Clause of the Fifth Amendment of the U.S. Constitution

entitles each Plaintiff to notice and an opportunity to be heard before they can be deprived of life, liberty, or property.

137.   Being "deprived of life" unequivocally implicates a constitutionally protected interest, U.S. Const. amend. V, and the U.S. Supreme Court has held that constitutionally protected "liberty interests are implicated" when the government plans to "inflict[] appreciable physical pain." *Ingraham v. Wright*, 430 U.S. 651, 674 (1977).

138.   Defendants have not disclosed sufficient information or details regarding the development and drafting of the Execution Protocol or the procedures that will be utilized in carrying out Plaintiff's execution pursuant to the Execution Protocol, thereby preventing Plaintiff from determining all aspects of the Execution Protocol that  violate provisions of federal law or constitute cruel and unusual punishment, from consulting medical experts concerning those aspects, and from determining and seeking to remedy the ways in which the Execution Protocol presents an avoidable risk of unconstitutional pain and suffering during his executions.

139.   In addition, the discretion the Execution Protocol gives the ODOC Director to change the implementation of death sentences means that Plaintiff will not have sufficient notice and opportunity to challenge the manner of his execution.

140.   Executing Plaintiff pursuant to the Execution Protocol would violate the Due Process Clause in the Fifth Amendment of the U.S. Constitution because it would deprive Plaintiff of his life and liberty without providing sufficient notice and opportunity to be heard on the execution procedures to be used.

**<u>Count II</u>**

**(Eighth Amendment Violation — Cruel And Unusual Punishment)**

141.    Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

142.    The Eighth Amendment forbids the Government, in carrying out a death sentence, from inflicting pain beyond that necessary to end the condemned prisoner's life. *In re Kemmler*, 136 U.S. 436, 447 (1890). "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life." *Id.; see also Baze*, 553 U.S. at 50 (execution violates the Eighth Amendment if it presents a "substantial risk of serious harm").

143.    Defendants intend to execute Plaintiff in a manner that is cruel and/or unreliable and that will inflict excruciating pain on Plaintiff. The execution procedure Defendants intend to use creates a substantial risk of inflicting grievous suffering and harm that is foreseeable and significant, but which is unnecessary and can be avoided.

144.    Because of the use of midazolam, a paralytic drug, and concentrated potassium chloride, the three-drug protocol carries significant risks of    pain    and    suffering,    as recognized by the United States Supreme Court. *Baze*, 553 U.S. at 114. In order for the execution to comport with the U.S. Constitution's prohibition against cruel and unusual punishment, the first drug must render the prisoner unconscious and insensate to painful stimuli prior to the injection of the second and third drugs. The second drug, which paralyzes all skeletal muscles, including the diaphragm, prevents the prisoner from drawing breath, moving, and speaking. The third drug, concentrated potassium chloride, if administered to a conscious person, causes excruciating pain that has been likened to the feeling of having one's

veins set on fire. Because midazolam, the first drug, both inflicts pain and suffering by triggering non-cardiogenic pulmonary edema and fails to induce and then maintain anesthesia throughout the execution, the prisoner will experience excruciating pain and conscious asphyxiation, but be unable to communicate that there is a problem.

145.   There are alternative methods of execution, as described above, that are "feasible, readily implemented, and in fact [would] significantly reduce the substantial risk of severe pain." *Baze*, 553 U.S. at 52.

146.   Because the Execution Protocol poses a substantial risk of serious harm to Plaintiff, it violates Plaintiff's constitutional right guaranteed by the Eighth Amendment of the U.S. Constitution to be free from cruel and unusual punishment

**Count III**
**(Eighth And Fifth Amendment Violation — Deliberate Indifference)**

147.   Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

148.   The Eighth Amendment forbids "deliberate indifference" to "serious medical needs of prisoners," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and to a substantial risk of serious harm to a prisoner, see *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

149.   Substantive Due Process affords similar protections: "[A] physician who acts on behalf of the State to provide needed medical attention to a person involuntarily in state custody (in prison or elsewhere) and prevented from otherwise obtaining it, and who causes physical harm to such a person by deliberate indifference, violates the [Constitution's] protection against the deprivation of liberty without due process." *West v. Atkins*, 487 U.S. 42,

58 (1988) (Scalia, J., concurring).

150.   The choice of a course of medical treatment may violate the Eighth Amendment where it is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974), vacated and remanded on other grounds sub nom. *Cannon v. Thomas*, 419 U.S. 813 (1974).

151.   Defendants are required to provide Plaintiff with appropriate medical care until the moment of his death. Thus, the Eighth Amendment's proscription against "deliberate indifference" requires that they administer the death penalty without the "unnecessary and wanton infliction of pain." *Gregg*, 428 U.S. at 173.

152.   The means chosen by Defendants to execute Plaintiff under the Execution Protocol constitute deliberate indifference to a substantial risk of serious harm to Plaintiff. Plaintiff has alleged several feasible and readily-implemented alternatives to the Execution Protocol that would substantially reduce the risk of substantial harm to Plaintiff.

153.   The Execution Protocol violates rights secured and guaranteed to Plaintiff by the Fifth and Eighth Amendments of the U.S. Constitution.

<u>**Count IV**</u>
**(First, Fifth And Sixth Amendment Violations — Access To Counsel)**

154.   Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

155.   Prisoners have a right under the First and Fifth Amendment of the U.S. Constitution to access to the courts. See, e.g., *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996);

*Wolff v. McDonnell*, 418 U.S. 539, 579 (1974).

156.   Prisoners also have a right under the Sixth Amendment of the U.S. Constitution to access to counsel at all "critical" stages of criminal proceedings. *United States v. Wade*, 388 U.S. 218, 227-28 (1967).

157.   Prisoners have the right to access to counsel throughout the execution procedure, including during an execution. See *Harbison v. Bell*, 556 U.S. 180, 194 (2009); *In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2018 WL 6529145, at **4-5 (S.D. Ohio Dec. 12, 2018).

158.   To assert an Eighth Amendment violation prior to or during execution, Plaintiff must be able to communicate that violation to his counsel, and counsel must be able to access the courts on the Plaintiff's behalf. Abridgement of either prisoner- counsel communication or counsel's access to the courts violates Plaintiff's constitutional right to access to counsel and the courts.

159.   The Execution Protocol does not provide Plaintiff with access to counsel during an execution. Therefore, under the Execution Protocol, Plaintiff will not be able to communicate with his counsel prior to and during the execution and will not be able to communicate with counsel regarding any problems, including constitutional violations.

160.   In addition, the Execution Protocol does not permit witnesses (including Plaintiff's attorneys or medical consultants) to view the setting of IVs and/or the syringes being pushed, so there is no way to identify, object to, challenge, or correct, any issues with the IV-setting or drug administration process, including constitutional violations.

161.   The Execution Protocol's deprivation of access to counsel and the courts prior

to and during the execution violates Plaintiff's rights under the First, Fifth, and Sixth Amendments.

## Count V

### (18 U.S.C. § 3599 Intentional Deprivation Of Right To Counsel)

162.   Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs of this Complaint as if set forth in full below.

163.   Under Section 3599(a)(2) of Title 18 of the U.S. Code, an indigent defendant's appointed attorney shall represent the defendant throughout every stage of available judicial proceedings, including all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, in addition to competency proceedings and proceedings for executive or other clemency as may be available to the defendant. *See Harbison*, 556 U.S. at 194.

164.   By denying Plaintiff meaningful access to counsel and to the courts during the preparation for, and carrying out of, his execution, Defendants intentionally will violate Plaintiff's rights under 18 U.S.C. § 3599.

## Count VI

### (Violation Of The *Ex Post Facto* Provision Of The United States Constitution And Article V, § 54 Of The Oklahoma Constitution)

165.   Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

166.   In accordance with Article I, Section 10, clause 1 of the United States Constitution, no State may enact a law which, by retroactive operation, creates a significant risk of increased punishment for a crime after the defendant has been sentenced.

167.    Article V., § 54 of the Oklahoma Constitution provides "[t]he repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute."

168.    At the time each of the offenses occurred that subjected Plaintiff to a death sentence, and at the time Plaintiff was sentenced to death, the law of Oklahoma required that "[t]he punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultrashort- acting barbiturate in combination with a chemical paralytic agent until death is pronounced by a licensed physician according to accepted standards of medical practice." 22 Okla. Stat. Ann. § 1014(A).

169.    Defendants are using midazolam, a benzodiazepine, instead of an "ultrashort-acting barbiturate," as the first drug in the three-drug execution process

170.    Unlike a barbiturate, midazolam cannot produce surgical anesthesia, cannot render Plaintiff insensate to pain, and will result in Plaintiff experiencing the excruciating pain and suffering caused by administration of the second and third drugs. The Execution Protocol thus creates a significant risk of increased punishment.

171.    Accordingly, the Execution Protocol is unconstitutional as an ex post facto law as applied to Plaintiff, and violates Article V., § 54 of the Oklahoma Constitution, which entitles Plaintiff to be executed in accordance with an "ultrashort-acting barbiturate" instead of midazolam.

## Count VII
### (14th Amendment Due Process Violation)

172.    Plaintiff realleges and incorporates herein by reference all of the preceding

paragraphs of the Complaint as if set forth in full below.

173.   Plaintiff has a protected life and liberty interest in being executed with the use of "an ultrashort-acting barbiturate" as required by 22 Okla. Stat. Ann. § 1014(A) (2010).

174.   The use of midazolam, instead of an ultrashort-acting barbiturate, imposes atypical and significant hardship on Plaintiff beyond the ordinary for those facing execution.

175.   Oklahoma law provides no adequate post-deprivation remedy for the harm that will be caused by Defendants' denial of Plaintiff's right to be executed with the use of an ultrashort-acting barbiturate. *See Cole v. Trammell*, 358 P.3d 932, 941 (Ok. Crim. App. 2015). Thus, Plaintiff's right to procedural due process as required by the Fourteenth Amendment is violated

## **Count VIII**
### **(Violation Of Religious Liberty Rights)**

176.   Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

177.   An alternative pleading requirement cannot be validly applied to Plaintiff under the circumstances. Doing so would force him to make the untenable, constitutionally repugnant choice of giving up his constitutional right to free religious

178.   Exercise, to vindicate his constitutional right to be free from a cruel and unusual execution, or vice versa. But the Supreme Court has held that "we find it intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394 (1968).

179.   In *Holt v. Hobbs*, 574 U.S. 352, 356 (2015), the Supreme Court held that the

religious liberty protections in the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb-1 et seq., apply to prisoners through its "sister statute," the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc et seq.

180.   The provisions of RLUIPA governing religious exercise by institutionalized persons "mirrors RFRA," such that RLUIPA "allows prisoners 'to seek religious accommodations pursuant to the same standard as set forth in RFRA.'"   *Holt*, 574 U.S. at 357-58.

181.   RFRA/RLUIPA's protections and provisions apply to all federal law, and the implementation of that law, whether statutory or otherwise. See 42 U.S.C. § 2000bb-3(a).

182.   Plaintiff has "sincerely held religious beliefs" and "religious objections" to participating in decisions and planning events that "facilitate" suicide. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

183.   The alternative-method requirement – imposing on Plaintiff the requirement to participate in orchestrating his own deaths – burdens Plaintiff's exercise of religion.

184.   Furthermore, even assuming for the sake of argument the act of pleading or proving an alternative method of execution might, itself, be an "innocent" action, it is certainly an innocent act that "has the effect of enabling or facilitating the commission of" his death, and is thus a sinful and immoral act that presents a significant burden on Plaintiff's honest convictions. *See Hobby Lobby*, 573 U.S. at 686.

185.   Thus, being required to choose, or plead, or prove, the manner or method of his death or otherwise assist Defendants to execute them violates Plaintiff's sincerely held religious beliefs, and he cannot be compelled to do so.

186.    The alternative-method requirement does not further a compelling governmental interest.

187.    Because Glossip interprets and adds a pleading requirement to a claim raised under a federal statute, and Bucklew assigns that requirement to the United States Constitution, it is the federal government's interest, not the states' interests, which must be examined.

188.    The federal government has no interest in allowing a state to carry out an execution in a manner that violates the Eighth Amendment.

189.    The only role that the federal government can legitimately have with respect to a state judgment is determining whether that judgment and the method of carrying out that judgment comports with the United States Constitution.

190.    There is no compelling federal governmental interest in states carrying out executions other than requiring that they do so within the limits of the United States Constitution.

191.    Requiring a plaintiff challenging a method of execution to plead a feasible alternative method does not further that governmental interest.

192.    Applying that standard to Plaintiff thus violates his rights under RFRA and RLUIPA.

193.    Even if the relevant governmental interest is the State of Oklahoma's interest in carrying out executions, that is an important interest, not a compelling one.

194.    The alternative-method requirement is not the least restrictive means of furthering the governmental interest in question here.

195.    Even if the federal government has a compelling governmental interest in the states' ability to carry out an execution, or even if the relevant governmental interest is Oklahoma's interest in seeing criminal sentences and judgments finalized, the method used here—requiring an inmate to choose the manner or method of his death and to assist the State by demonstrating that manner or method is available and readily implemented—is not the least restrictive method to achieve those interests.

196.    The least restrictive alternative is to require the ODOC to follow the United States Constitution and not use methods of execution that violate the Eighth Amendment by causing a sure or very likely risk of severe pain and needless suffering.

197.    Plaintiff has alleged the alternative pleading requirement of Glossip burdens his exercise of religion by violating his sincerely held religious beliefs, does not further a compelling governmental interest, and even if it did further that interest, it is not the least restrictive method of furthering that interest.

198.    Applying the alternative-method requirement to Plaintiff therefore violates RFRA and RLUIPA, and cannot be enforced here.

199.    Consequently, under the religious-freedom protection statutes, Plaintiff can sufficiently allege a Baze-Glossip Eighth Amendment challenge to the Execution Protocol as causing unconstitutional pain and suffering, without needing to plead or prove an alternative execution method or manner.

200.    In addition, any requirement that Plaintiff demonstrate that there is a readily available and feasibly implemented alternative execution method or manner of execution in order to prevail on an Eighth Amendment challenge violates Plaintiff's rights to conscience

and/or to the free exercise of religion under the First and/or Ninth Amendments to the United States Constitution.

201.    Nonetheless, if Plaintiff is compelled to make a specific choice as to the manner in which he will be put to death, Plaintiff will agree to do so at that time.

## Count IX
### (Eighth And Fourteenth Amendments - Experimentation On Captive Human Subjects)

202.    Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

203.    Both the liberty clause of the Fourteenth Amendment and the cruel and unusual punishment clause of the Eighth Amendment recognize that persons shall be treated with dignity and consistent with evolving standards of decency.

204.    Defendants have failed to test the execution drugs and/or the execution procedures on non-human animals before using them on captive and unwilling human subjects.

205.    Without the benefit of animal-testing results, the use of the execution drugs and the execution procedures constitute high-risk experimentation with lethal drugs on human subjects.

206.    Defendants are conducting experiments without any scientifically sound expectation that these experiments will succeed in producing an execution that does not inflict severe pain, needless suffering or a lingering death.

207.    Experimentation on human beings who have not provided consent violates an

individual's substantive due process right to liberty and a prisoner's right to be free from cruel and unusual punishment and violates Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution

## Count X

### (First And Fourteenth Amendment: Right Of Access To GovernmentalInformation)

208.    Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

209.    Plaintiff has a right of access to governmental proceedings and information about those proceedings, guaranteed by the First and Fourteenth Amendments to the United States Constitution.

210.    Defendants deliberately conceal and refuse to provide critically relevant information concerning identification of the source of the drug and that entity's experience, training, qualifications, credentials, and performance history.

211.    Defendants' deliberate concealment of information that would enable Plaintiff to determine how Defendants intend to carry out his death sentence, including the failure to disclose in advance of the execution details about the drugs used, the rationale for the selection of these drugs and their dosages, the qualifications and training of the persons administering them, and Defendants' ability to prepare for and respond to complications that may arise during an execution, deprive Plaintiff of his First Amendment right of access to governmental proceedings.

212.    The lack of transparency interferes with Plaintiff's access to information about flaws in Defendants' execution method(s), to include, without limitation, procedures used to

administer the drugs and the function, or lack thereof, of the drugs themselves.

213. The Execution Protocol effectively prevents Plaintiff, as a member of the public, from obtaining information regarding governmental proceedings and therefore deprives Plaintiff of his First and Fourteenth Amendment rights.

214. Plaintiff has a First Amendment interest in being informed of the means by which the state intends to carry out executions.

215. Defendants' refusal to provide Plaintiff with information sufficient to enable him to determine how Defendants intend to execute them violates Plaintiff's First Amendment right to petition the government for redress of grievances.

216. Further, Defendants' deliberate concealment and refusal to provide information deprives Plaintiff of his right to notice and an opportunity to be heard, in violation of the Due Process Clause of the Fourteenth Amendment. By failing to require and provide adequate notice of exactly which method of execution the Defendants will use, and of the identification information of the source of the drugs, Defendants are depriving Plaintiff of his right to notice and an opportunity to be heard in the form of a constitutional challenge to Defendants' execution method.

217. Plaintiff will have no meaningful opportunity to challenge critical aspects of the written execution protocol if he is not informed in advance about the source of the execution drug(s) to be used for his execution, the specific involvement of each and every Defendant, and the identification information of the source providing the drugs to be used.

218. Nor will Plaintiff have a meaningful opportunity to challenge the use of execution drugs compounded for the sole purpose of killing him, which have a substantial,

objectively intolerable risk of being something other than the pure, sterile, unadulterated, not-expired/not past their beyond-use date, not-imported drugs of the proper potency, content, pH level and other relevant characteristics, as required to be used by the Execution Protocol.

## Count XI

### (Fourteenth Amendment: Right To Equal Protection)

219.   Plaintiff realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

220.   Plaintiff has a right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

221.   Plaintiff requested to participate in the Glossip action, but was denied in writing by class counsel the right to do so.

222.   By being denied the right to participate in the Glossip action as a plaintiff, Plaintiff was denied the right to make an alternative choice of execution method, and thus ultimately the right to go to trial upon that choice, a right that has been accorded plaintiffs who participated in the Glossip action.

223.   Such denial of the right of access to the courts of the United States constitutes a denial of Plaintiff's right of equal protection as provided for in the 14th Amendment to the United States Constitution.

## Count XII

### (Eighth and Fourteenth Amendment Violations — Cruel and Unusual Punishment and Due Process)

224.    Plaintiff realleges and incorporates herein by reference all of the preceding

paragraphs of the Complaint as if set forth in full below.

225.    Based on the above factual issues, it cannot be said with absolute certainty that Plaintiff committed the murder of which he was convicted.

226.    Plaintiff has maintained his innocence throughout.

227.    The only way to ensure our society does not execute innocent people is to require jurors to find guilt by an "absolute certainty."  Otherwise the possibility of scientific advancements or other processes that might prove innocence later cannot be utilized to protect innocent people if they have already been executed.

228.     The Commission report determined the state should institute a procedure to ensure innocent people are not put to death by the state.  The state has failed to institute this recommendation into the protocol and should the state be allowed to proceed with execution of Plaintiff his rights will have been violated.

229.    The execution of an innocent man is "cruel and unusual punishment" in violation of the Eighth Amendment.

230.    The fact Plaintiff was not found to be guilty by an "absolute certainty" is a violation of his due process rights under the Fourteenth Amendment.

WHEREFORE, in order to prevent the violations of Plaintiff's rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, Plaintiff respectfully requests that the Court enter a judgment:

    a.    declaring that the Defendants' actions, practices, customs, and policies with regard to their means, methods, procedures, and customs regarding

executions, and specifically the Execution Protocol and the possibility of executing an innocent person when a jury has not determined by an "absolute certainty" the guilt of said individual, are illegal and violate the First, Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution, and the Oklahoma Constitution;

b.   vacating the Execution Protocol and enjoining Defendants and all persons acting on their behalf from using the Execution Protocol, or any revised protocol that violates Plaintiff's rights and the law, for the same reasons challenged above;

c.   granting Plaintiff his reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and the laws of the United States; and

d.   granting such further relief as the Court deems just and proper.

Dated:        October 12, 2021        Respectfully submitted,

_s/ Gregory W. Laird_
Gregory W. Laird, OBA # 18093
Law Office of Gregory W. Laird
P.O. Box 52043
Tulsa, OK 74152
greglairdlaw@gmail.com
(405) 264-3553

COUNSEL FOR PLAINTIFF