## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

BIGLER JOBE STOUFFER,      )
)     **Case No. 21-CV-1000-F**
    **Plaintiff,**      )
)
      **Vs.**      )
)
**SCOTT CROW, et al.**      )
)
    **Defendants.**      )

### CAPITAL CASE
### PENDING EXECUTION DATE:
### DECEMBER 9, 2021

### PLAINTIFF'S SUPPLEMENTAL MOTION FOR PRELIMINARY INJUNCTION AND STAY OF EXECUTION PENDING DISPOSITION OF PLAINTIFF'S COMPLAINT FILED HEREIN PURSUANT TO 42 U.S.C. SECTION 1983

Plaintiff Bigler Jobe Stouffer ("Stouffer") respectfully requests that this Court grant him a stay of execution pending the resolution of his complaint filed herein pursuant to 42 U.S.C. section 1983. Plaintiff's has a pending execution date of December 9, 2021.

### I.    FACTUAL BACKGROUND

**Events Prior to August 25, 2021**.  For reasons that remain unclear to Stouffer, when the *Glossip* v. Chandler case was filed on June 25, 2014 (Civ. No. 14-cv-665-F, U.S. District Court, W.D. Oklahoma ) ("*Glossip*"), Stouffer was the only person on Oklahoma's death row to be excluded from that action.   By written letter, Plaintiff's request to participate in *Glossip* was rejected by plaintiffs' counsel, who believed and represented that he would not suffer any harm by not being included in the *Glossip* case.

Stouffer submitted a pro se motion to intervene in the *Glossip* case on November 20, 2014. (Ex. 1.) On December 11, 2014, the defendants in *Glossip* (employees and other representatives of the State of Oklahoma, hereinafter sometimes referred to as the "State") opposed Plaintiff's motion to intervene, arguing that "[t]his case has been proceeding since June [2014], and significant discovery and preparation has already been done, as this Court is well aware, Mr. Stouffer's attempt to enter the case now, as far as it has progressed this far, should not be allowed. Mr. Stouffer's entrance would likely trigger more discovery, further pleadings, and would likely burden this Court over and above the normal pressures involved in this case." (Ex. 2.)

In addition, the State also opposed Stouffer's motion to intervene because he was pro se, arguing, "[t]his issue would be further complicated by the fact that Mr. Stouffer is not represented and instead is proceeding pro se. This adds another wrinkle to a case that is already very complex. Therefore, Defendants request that this Court deny Mr. Stouffer's request." *Id.* Counsel for the *Glossip* plaintiffs took no position on Stouffer's motion. Stouffer replied, stating that his counsel advised him not to join the action until his habeas corpus proceeding was complete. (Ex. 3.)

On December 22, 2014, this Court denied Stouffer's motion (Ex. 4.)  In so doing, and while agreeing with the State in part on procedural grounds, the Court also noted that Stouffer could not show any harm by not being included in *Glossip*. Specifically, the District Court ruled:

> Mr. Stouffer states no grounds for relief which indicate that he must be a
> named plaintiff in this action in order to receive the benefit of any ruling
> which might arguably benefit the named plaintiffs, whether at this or a later

stage. Mr. Stouffer identifies no exigencies which pertain to his personal situation and which might suggest the need to allow him to intervene. *Id.*

Needless to say, and although the Court declined to allow Stouffer to participate directly in *Glossip*, Stouffer was relieved to see the language quoted above and subsequently relied on the fact that even if he was not a party to the *Glossip* case, he would "receive the benefit of any ruling which might arguably benefit the named plaintiffs, whether at this or a later stage". Based on the foregoing language, Stouffer made no effort to appeal the December 22, 2014, Order. Instead, and at all times since the order was entered, Stouffer reasonably believed that his rights were adequately protected by the District Court's December 22, 2014, Order.

Ten months later, on October 16, 2015, the District Court in *Glossip* entered an Order granting a joint stipulation by the *Glossip* Plaintiffs and the State ("Joint Stipulation"). (Exs. 5-6.) The Joint Stipulation provided that the *Glossip* action would be administratively closed for an indefinite period of time, pending completion of investigations and other measures pertaining to Oklahoma's execution procedures. Included in the Joint Stipulation was the agreement by the State of Oklahoma that it would not seek to schedule executions of the *Glossip* plaintiffs or any other condemned prisoners in Oklahoma no sooner than 150 days after a new execution protocol had been approved and provided to the *Glossip* plaintiffs for review.

Specifically, the Joint Stipulation included the following commitment to all condemned prisoners in Oklahoma: "It would be in the interests of judicial economy and comity for the Oklahoma Attorney General not to seek an execution date from the

Oklahoma Court of Criminal Appeals for any of the Plaintiffs or any other condemned prisoners until after counsel for Plaintiffs are provided the following. …".  Needless to say, the foregoing language in the Joint Stipulation reinforced the comments in the Court's December 22, 2014, Order denying Plaintiff's motion to intervene.

Fifteen months later, on March 6, 2017, the State of Oklahoma, through its Assistant Attorney General, filed in the case of *Bigler Jobe Stouffer v. State of Oklahoma* in the Oklahoma Court of Criminal Appeals (Case No. D-2003-277) a "Notice Pursuant to 22 O.S. 2011, § 1001.1, Regarding Execution Date" referencing the Joint Stipulation ("March 2017 Notice"). (Ex. 7.) The State's March 2017 Notice represented that investigations arising from the Joint Stipulation had been completed, but that other requirements necessary to trigger the 150 day period described in the stipulation had not yet been completed. As such, the State affirmatively claimed that "the setting of Stouffer's execution date by this Court is not appropriate at this time." *Id.* By submitting the March 2017 Notice in an action in which Stouffer was the only party, the State reinforced the fact that the commitments made in the Joint Stipulation applied to Stouffer at the time the Joint Stipulation was entered and continued to apply to him as of the date the March 2017 Notice was filed.

That the March 2017 Notice named only Stouffer, it confirmed his understanding formed over two years earlier based on the December 22, 2014, Order denying him the right to participate in *Glossip* as a named Plaintiff; namely, that no execution date would be set for him until the constitutional issues raised in the *Glossip* case had been fully and fairly presented, and a final judgment resolving the issues had been entered. Of course, if

the Oklahoma protocol was found to violate the constitution, as Stouffer expected, no execution based on the protocol could ever be scheduled.

Nearly three years later, on or about February 13, 2020, the State contended that it had met all requirements necessary to trigger the 150-day period to resume executions pursuant to the Joint Stipulation, meaning that on or about July 12, 2020, the State would for the first time since the entry of the Joint Stipulation be authorized and in fact required to resume setting execution dates. (*See* August 31, 2021, Reply to Appellant's Objection to Setting of Execution Date, filed by the State in *Stouffer v. State*, Case No. D-2003-277, pp. 1-2 and n. 2.) (Ex. 11.)

On May 5, 2020, a hearing was held in the *Glossip* action. (Ex. 8.) During that hearing, which addressed the Joint Stipulation and whether the State had complied with the requirements necessary to trigger the 150-day period, the following exchange occurred between *Glossip*'s counsel, the Court, and the State's counsel:

> MR. COHEN: Yes, Your Honor. If I might, I just wanted to -- and I appreciate the fact that the formal motion to enforce the prior order has been denied.
>
> I would like to address and perhaps by agreement get some confirmation that the State will not seek execution dates until after this case has been completed. I think that makes sense. I think it's fair. I think it's reasonable. And I just wanted to throw it out there as --
>
> **THE COURT: Well, I'm not even going to invite the defendants to respond to that because I had the representation last March from none other than the Attorney General of Oklahoma that that would not happen. And if we should have any indication that that will happen, I will be, to put it mildly, immediately available, so it's not necessary to address that.**
>
> MR. COHEN: Thank you, Your Honor.
>
> THE COURT: Anything further this afternoon from the defendants?

MR. CLEVELAND: No, Your Honor.

THE COURT: Very well. Court will be in recess. (*Id.* at 31:12-25) (Emphasis added)

As set forth above, and as understood by Stouffer at the time, the relief requested by *Glossip* plaintiffs' counsel, and the State's agreement not to set execution dates as described by the Court, included broad categorical language similar to language in the Joint Stipulation, specifically, that **no execution dates** would be set until the issues in *Glossip* had been resolved.  If the commitment applied only to the *Glossip* plaintiffs, which of course would make no sense, counsel for the *Glossip* defendants had a duty to say so at the hearing, and the failure to do so amounts to an estoppel to make such a claim at this time.

Not long thereafter, on or about July 12, 2020, the 150-day tolling period under the Joint Stipulation expired, but the State chose not to request execution dates for any *Glossip* plaintiffs or for Plaintiff, notwithstanding a legal obligation to do so if it were not bound by the agreement described by the Court at the May 5, 2020, hearing. That the State did nothing confirms that it understood it was prevented from doing so based on the promise made by the Oklahoma Attorney General that it would not ask for any execution dates until the *Glossip* action was completed.  On July 23, 2021, a new Attorney General for the State of Oklahoma was appointed.

**The August 25, 2021 Notice**.  Nearly seven years after Stouffer was first assured that he would "receive the benefit of any ruling which might arguably benefit the named plaintiffs, whether at this or a later stage," six years after the Joint Stipulation was filed with the categorical promise that no execution dates would be set, four years after the State announced to the Oklahoma Court of Criminal Appeals that based on the Joint Stipulation

it was not appropriate to schedule Stouffer's execution, and fifteen months after the Court announced the agreement by the State that no executions would be scheduled, wherein the Court offered to "..to put it mildly" that it would be "immediately available" to enforce the agreement if the State of Oklahoma breached its promise, the State of Oklahoma opportunistically, arbitrarily and capriciously attempted to schedule Stouffer's execution for November 18, 2021 (eventually set for December 9, 2021).

By way of example, without limitation, the State could have addressed Stouffer's situation during an October 25, 2021, hearing, during which the enforceability of the agreement not to schedule executions was discussed. (Ex. 14.) Instead, during that hearing, the State argued that the agreement no longer applied to the six *Glossip* plaintiffs who had failed to elect an alternative method because, as to those plaintiffs, the *Glossip* litigation was over. Of course, this argument could not and does not apply to Stouffer because his case is still pending before this Court. At the conclusion of the hearing, the Court assessed the status of the agreement as to the six inmates whose cases had been dismissed, as follows:

> I'll first address the issue of the agreement that has been referred to both in the motion, and to some lesser degree, here in court.
>
> * * *
>
> First, all of the claims that these five plaintiffs have asserted in this district court have been dismissed under Rule 12 or adjudicated by way of summary judgment under Rule 56.
>
> Then the Rule 59 motion for reconsideration was filed, briefed and denied. The case is complete in this Court as to these five plaintiffs.
>
> To my great relief, in March of 2020, the Attorney General of Oklahoma acquiesced in my suggestion that none of the plaintiffs should be

set for execution, as long as there was anything for him to litigate in this Court.

Given the number of years that have elapsed since these plaintiffs stood trial and were convicted, that was no small concession by the Attorney General, taking into account the interest of the State in carrying out these sentences, after decades of litigation, as well as the interest of the surviving families and other victims.

As to these five plaintiffs, there is nothing more to litigate in this Court.

In May of 2020, I effectively assured all of the plaintiffs that we would be back here quickly if the Attorney General went back on that understanding.

Because there is nothing more for these five plaintiffs to litigate in this Court, the State of Oklahoma has not gone back on that understanding.

Aside from that, in March and May of 2020, neither the Court nor the Attorney General had any indication that there would be a subset of the 32 plaintiffs who would, after being given more than one chance to designate an alternative method, would expressly decline to do so.

The plaintiffs in that subset effectively carved themselves out of Count II, which is the only count remaining to be tried as to the other 27 plaintiffs.

(Ex. 14 at 139:33-141:10.) The Court's comments during the October 25, 2021, hearing were consistent with and re-affirmed the existence of the State's promise not to schedule execution dates for any condemned prisoner until the constitutional challenges raised in *Glossip* had been considered and resolved.  The Court's ruling to allow executions to proceed for the *Glossip* plaintiffs who had been dismissed out (presently on appeal) was based on the Court's conclusion that the claims of those plaintiffs had been resolved and, as such, proceeding with executions of those individuals was compliant with the promises made by the State. As to all other condemned prisoners in Oklahoma, Stouffer being the

only other one, the comments by the Court correctly re-affirmed the agreement by the State not to proceed.

In summary, the State can offer no principled explanation why the commitments it made to all condemned prisoners in Oklahoma no longer apply to Stouffer. The effort to treat Stouffer as if he had been a named plaintiff in *Glossip* but refused to designate an alternative method of execution ignores the history set forth above and is nothing more than a sleight of hand. If the execution of Stouffer proceeds, under the circumstances set forth in this motion, it will be based on the fact that Stouffer's trust that the State would abide by the promises made to him repeatedly over the years was ill-founded, coupled with the failure of the system to hold the State accountable or, in the alternative, is a violation of his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

As the Court is undoubtedly aware, after the stays were lifted on the non-designating plaintiffs, John Grant, was executed on October 28, 2021. The Court declined to intervene on Grant's behalf, based on assurances from an expert for the State that Grant's execution would be humane and consistent with the constitution, despite a witness called by counsel for Grant who testified as to what problems he had observed in executions administered using protocols similar to the one adopted by Oklahoma. Thereafter, according to Fox News, Grant, "who was strapped to a gurney inside the execution chamber, began convulsing and vomiting after the first drug, the sedative midazolam, was administered. Several minutes later, two members of the execution team wiped the vomit from his face and neck." Clearly, questions about the procedure in Oklahoma persist.

## II.    LEGAL STANDARD

"[A] stay of execution is an equitable remedy, and an inmate is not entitled to a stay of execution as a matter of course." *Hill v. McDonough*, 547 U.S. 573 (2006). In deciding whether to issue a stay of execution, a court must consider: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other party interested in the proceeding; and (4) where the public interest lies. *See Nken v. Holder*, 556 U.S. 418 (2009); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   A motion for a stay, however depends on the operation of equity.  *See Hill*, 547 U.S. at 584, 126 S.Ct. at 2104.

In balancing these four factors and in cases where what is sought is the minimum injunction required to maintain the status quo the Tenth Circuit has applied a relaxed standard other than likelihood of success. In such cases, as here, this relaxed standard applies, where the movant satisfies the other three requirements for a preliminary injunction and is not asking for an injunction that alters the *status quo. See generally Kikumura v. Hurley*, 242F.3d 950, 955 (10th Cir. 2001). Specifically, the Court has stated that it will ordinarily be enough in such cases for the movant to raise questions regarding the merits that are so serious, substantial, difficult and doubtful as to make them a fair ground for litigation. *Id.* Stouffer acknowledges the Court has stated it disagrees that the relaxed standard applies; however, Stouffer respectfully disagrees with the Court and asks the Court to implement the lower standard in this case. That said, Stouffer avers he is entitled to relief under the "normal' standard as well.

In a capital case, the likelihood of success factor is satisfied when the plaintiff makes a "substantial showing of the denial of a federal right." *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983) (citation and quotation marks omitted). That showing is made if the plaintiff shows that the "issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further." *Id.* At 893 n. 4 (citation and quotation marks omitted).

## III.   ARGUMENT

Stouffer has raised several claims within his complaint. The majority of those claims have been previously raised by 32 other Oklahoma death row inmates in *Glossip v. Chandler, et al,* Civ. No. 14-cv-665-F, U.S. District Court, W.D. Oklahoma (*Glossip*). Although Stouffer believes all of his claims will likely succeed on the merits at some point in the litigation, this Motion will not focus on all of them.

**A. Likelihood to Succeed on the Merits.**

**a. The Undisputed Facts Prove Stouffer will Likely Succeed on His Equal Protection Claim.**

In the First Claim for Relief contained within his First Amended Complaint, Stouffer claims the Defendants are violating his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution which states:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

In other words, the laws and actions of a state must treat an individual in the same manner as other people in similar conditions and circumstances because the clause 'is essentially a direction that all persons similarly situated should be treated alike.' " *Kitchen v. Herbert*, 755 F.3d 1193, 1222 (10th Cir.) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)), *cert. denied*, —— U.S. ——, 135 S.Ct. 265, 190 L.Ed.2d 138 (2014).

Although the Equal Protection Clause generally applies to groups, it can apply to a "class of one" such as Stouffer. In *Village of Willowbrook v. Olech,* the Supreme Court held that a plaintiff may state a "class of one" claim by alleging that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam); *see also  A.M. v. Holmes, 830 F.3d 1123, 1166–67 (10th Cir. 2016) citing 3 Ronald D. Rotunda & John E. Nowak, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE* § 18.2(a) (5th ed. 2012) ("If the government applies the law in a certain manner to all persons except a single individual, that single individual may bring an equal protection claim against the government even though the individual is 'a class of one.'). Where, as here, a plaintiff brings a class-of-one claim, [he] must demonstrate (1) that "other 'similarly situated' individuals were treated differently" from [him], and (2) that "there is no 'rational basis' for [the different treatment]." *SECSYS, LLC v. Vigil,* 666 F.3d 678, 688–89 (10th Cir. 2012) (citations omitted).

Although, the Tenth Circuit in *A.M. v. Holmes* stated that "class of one" claims should be approached with caution because "the sample size in a class-of-one claim is

obviously too small to permit a plaintiff to paint the contours of the claim in broad brushstrokes." *at* 1167. The Tenth Circuit went on to say that "[i]t is therefore imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the [allegedly] favored class. This is because, at its core, the Equal Protection Clause …. keeps governmental decisionmakers from treating differently persons *who are in all relevant respects alike." Id.* (citations omitted)(quotations omitted).

There were 33 inmates (now 32, after Grant's recent execution) on Oklahoma's Death Row whose appeals are exhausted and their cases are ready for the State to request an execution date. Of those, as of August 1, 2021, thirty-two of them were plaintiffs in *Glossip*. All 33 have filed an Eighth Amendment claim asserting that constitutionally impermissible pain and suffering will result from the use of the three-drug protocol (midazolam, vecuronium bromide and potassium chloride) contained in the current protocol. (*Comparing* Claim X of Plaintiff's First Amended Complaint with the Second Claim of the *Glossip* groups Fourth Amended Complaint). In all 33 cases, there are families of the victim who want "justice" and who want the sentences carried out in a timely manner.

However, 32 of the 33 inmates were given the opportunity to choose a "feasible and readily implemented" alternative to said protocol. *Bucklew* at 1125. 32 of the 33 inmates were given an opportunity to litigate their claim. 32 of the 33 inmates were given the opportunity to defend a Motion for Summary Judgement filed by the state. Moreover, it is indisputable the State agreed not to seek execution dates against 32 of the 33 inmates until

their lawsuit was "complete."[1] Stouffer is the only member of the 33 who has not been given the opportunity to make a choice, litigate his claim, defend summary judgment and potentially receive a trial on the merits. Stouffer is the epitome of a "class of one" as defined by the <u>Olech</u> court.

The second prong of the <u>Olech</u> test requires a plaintiff to "then show this difference in treatment was without rational basis, that is, the government action was irrational and abusive, and wholly unrelated to any legitimate state activity." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011)(citations omitted)(quotations omitted). The Tenth Circuit in *Kansas Penn Gaming* went on to state that this standard is "objective—if there is a reasonable justification for the challenged action, we do not inquire into the government actor's actual motivations." *Id.* (citations omitted)(quotations omitted.). In this case there is no reasonable justification to treat Stouffer differently.

Moreover, "In cases not involving judgments that are 'subjective and individualized,' the plaintiff will meet this burden easily. *Id.* at 1218.

> For example, in *Olech*, the defendant village appeared to have a long-held policy of requiring a 15–foot easement of *all* property owners who requested access to the municipal water supply, regardless of difference in cost or circumstance. 528 U.S. at 563, 120 S.Ct. 1073. Accordingly, when the village demanded that the Olechs alone agree to a 33–foot easement, without suggesting any proper reason for the deviation, it was likely that the village was motivated by improper political animus.

---

[1] Plaintiff in a separate claim argues the agreement should apply to him as well and the State has said it does not.  Should the Court find the Agreement applies to him, then the Court must grant the injunction on that claim

*Id.* Similarly, in Oklahoma, 21 O.S.2021, §1001.1 requires the Attorney General's Office to seek execution dates on all 33 of the death row inmates because they meet the conditions contained therein; however, the State allowed 32 of those inmates to litigate their claims before filing against any of them.  The State can state present no legitimate state interest for filing against Stouffer and no others; hence, the second prong described by the <u>Olech</u> court is likely to succeed at trial.

In sum, there were 33 similarly situated individuals on death row (now 32), all of whom "ready" for execution dates to be set and all of whom filed the same Eighth Amendment claim for relief stating the state's execution protocol using the three drug cocktail will subject each to an unacceptable risk of a constitutionally unacceptable level of pain and suffering.  The state allowed 32 of them to proceed in federal court on their lawsuit all the way through summary judgment and allowing each of them to submit or not submit their choice for an alternative method as discussed in *Bucklew*.  All of the underlying criminal cases involve families of victims who want "justice" for the crimes for which the individuals are convicted and want the sentence carried out in a timely manner. However, the State is not allowing Stouffer the same treatment as the other 32 and can state no rational basis for treating him differently.  Accordingly, this Court must determine that Stouffer is likely to succeed on the merits of this claim.

> **b. Stouffer is Very Likely to, at a Minimum, Proceed Past Summary Judgment and Receive a Trial on the Merits on his Eighth Amendment Claim for Relief Alleging the State's Three Drug Cocktail Submits Him to Cruel and Unusual Punishment.**

The Eighth Amendment forbids the Government, in carrying out a death sentence, from inflicting pain beyond that necessary to end the condemned prisoner's life. *In re Kemmler*, 136 U.S. 436, 447 (1890). "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life." *Id.*; *see also Baze v. Rees,* 553 U.S. 35, 50 (2008) (execution violates the Eighth Amendment if it presents a "substantial risk of serious harm").

The proposed method of execution of Stouffer under the new protocol (which has now been tested once – unsuccessfully – on John Grant) would result in Stouffer's execution being carried out in a manner that is predictably cruel and/or unreliable, and that will inflict excruciating pain upon him, potentially including (but not limited to), as occurred with Grant, body convulsions, vomiting, and choking on his own vomit. In *Glossip*, this Court determined that serious questions remain with respect to the new execution protocol and whether it creates a substantial risk of inflicting grievous suffering and harm that is foreseeable and significant, but which is unnecessary and can be avoided. (See *Glossip* Doc. 449). The Court's serious questions were answered in Grant's final minutes. *Glossip* plaintiffs are proceeding to trial to resolve that very question.

The Court addressed the identical Count II in *Glossip* in its August 11th Order on summary judgment, analyzing the parties' arguments in the context of a two-prong test: (1) whether "the state's method presents 'a substantial risk of severe pain'"; and (2) whether "the alternative method of execution the prisoner is obliged to propose [is] 'feasible and readily implemented,' and [is] one that 'the State has refused to adopt without a legitimate penological reason.'" (*Glossip* Doc. 449 at 6-7). With respect to the first prong, the Court

declined to grant summary judgment against the *Glossip* Plaintiffs, finding their attacks on the purported safeguards of the new protocol were supported by "credible expert criticism." (*Id.* at 14-15). Regarding the second prong, the Court found that fact issues further precluded granting summary judgment as to each of the four alternatives identified in the *Glossip* Third Amended Complaint, which are similarly enumerated in Stouffer's First Amended Complaint. (*Id.* at 23-26).

Moreover, while the Court did grant summary judgment as to the Religious Objector Plaintiffs in *Glossip* on the basis that they "declined to proffer an alternative for carrying out their sentence of death" (*id.* at 18-19), Stouffer has not been given an opportunity to choose, based on his reliance on the Court's December 22, 2014, Order. As will be reflected in Stouffer's testimony, Stouffer has made a choice. Thus, without taking a position as to the District Court's interpretation of *Bucklew v. Precythe*, 139 S.Ct. 1112 (2019), Stouffer has satisfied any arguable criteria.

As the Court found that serious questions of fact precluded granting summary judgment as to each of the four alternative methods of execution in *Glossip* (Doc. 449 at 23-26), Stouffer should be accorded no lesser treatment and should be allowed to proceed to trial or adopt the ultimate results of the *Glossip* action as to all overlapping claims.

### c. Stouffer is Likely to Prevail on Count X – Human Experimentation.

In Count X of the First Amended Complaint, Stouffer alleges that the use of the protocol constitutes impermissible human experimentation on captive human subjects. Stouffer is likely to succeed on this claim. The Due Process Clause of the Fourteenth

Amendment affords a substantive due process right to be free from human experimentation. *In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2017 WL 2964901 at *17 (S.D. Ohio July 12, 2017) (citing *Rochin v. California*, 342 U.S. 165 (1952)). That right extends to the lethal injection context. *See id.* As one court has explained, "[t]here is absolutely no question that Ohio's current protocol presents an experiment in lethal injection processes." *In re Ohio Execution Protocol Litig*., 994 F. Supp. 2d 906, 913 (S.D. Ohio 2014); *see also In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2017 WL 2964901 at *17 (S.D. Ohio July 12, 2017) ("Judge Frost's observation that the use of a new protocol for that process 'presents an experiment' and 'to pretend otherwise . . . would be disingenuous' is correct" (citation omitted). The Tenth Circuit has suggested that such a claim is viable and "subject to the principles or mode of analysis outlined in [*Baze v. Rees*, 535 U.S. 35 (2008)]." *Warner v. Gross*, 776 F.3d 721, 736 (10th Cir. 2015). That rationale is consistent with other courts that have considered the issue in the lethal injection context and concluded that the potential success of a prisoner's human experimentation claim based on a lethal injection protocol depends on the degree of risk posed by the protocol at issue. *See, e.g., In re Ohio Execution Protocol Litig.*, 994 F. Supp. 2d at 913.

The district court is still evaluating the risk posed by the Execution Protocol. The court stated in its August 11, 2021, Order in *Glossip* that it remains an open question "whether midazolam does or does not perform as intended when used as specified in the protocol[]" and invited the State of Oklahoma to execute the Appellants before the trial on Count II to "eliminate speculation[.]" (*Glossip* Doc. 449 at 15-16, n.13) To aid in its resolution of that question, the Court directed the parties in *Glossip* to present evidence at

the February 2022 trial from executions conducted under the new protocol. *Id.* at 15-16 n.12 (explaining how the evidence at trial "may well [include] a track record under . . . the new Oklahoma protocol," given that executions would presumably take place (and one now has) before the trial on Count II). In its scheduling order, the Court explicitly invited the *Glossip* parties to present evidence at trial from all such subsequent executions. (*Glossip* Doc. 456 at n.2).

This is a novel situation which would effectively treat Stouffer as a lab rat for evaluating the efficacy of the new protocol. Even if the Court ultimately finds the protocol at issue in this case constitutional, executing Stouffer prior to that finding necessarily constitutes human experimentation because the constitutionality of the protocol necessarily will remain uncertain up until the Court rules. *See In re: Ohio Execution Protocol Litig.,* 994 F. Supp. 2d at 913 ("an experiment in lethal injection processes" is acceptable only "until such experimentation sufficiently risks running afoul of the constitution protections afforded every citizen, regardless of his or her status, crime, or punishment") (citing *Cooey v. Strickland (Biros)*, 589 F.3d 210, 229-30 (6th Cir. 2009)). Because the risk posed by Oklahoma's lethal injection protocol remains an open question, executing Stouffer without first resolving that question—without Stouffer himself becoming an evidentiary exhibit— constitutes human experimentation. Thus, Stouffer is likely to succeed on the merits of this claim.

### d. Stouffer Is Likely to Succeed on Count III – Promissory Estoppel / Detrimental Reliance.

Promissory estoppel, which is grounded in the Restatement (Second) of Contracts § 90, has been incorporated into Oklahoma common law. *Russell v. Board of County Commissioners*, 952 P.2d 492, 503 (OK 1997). Section 90 of the Restatement states in part: "(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires. * * *" *Id.* The elements necessary to establish promissory estoppel are: "(1) a clear and unambiguous promise, (2) foreseeability by the promisor that the promisee would rely upon it, (3) reasonable reliance upon the promise to the promisee's detriment and (4) hardship or unfairness can be avoided only by the promise's enforcement." *Id.*

In addition, when the promise is made in the Court's presence, reliance on the statute of frauds is precluded and the promise can rise to the level of an enforceable contract. *See Gibson v. Arnold*, 288 F.3d 1242, 1246-1246 (10th Cir. 2002).

Here, considering all of the facts referenced above, along with relying on the Court's Order, Stouffer also reasonably relied on the conduct and unequivocal promise of Defendants through the Attorney General of Oklahoma that no condemned prisoners would be executed until the *Glossip* action was completed. Defendants not only made that promise in the presence of the Court, the Attorney General made that promise *to* the Court. Stouffer's reliance caused him to refrain from further pursuing intervention in *Glossip* or

otherwise pursuing litigation of his rights until he was put on notice of the State's intent to set his execution in August 2021. Stouffer has thus satisfied the elements of promissory estoppel.

Moreover, the conduct of Defendants after the Joint Stipulation, *e.g.*, a mix of reassurances and the failure to contest the fact that Stouffer was encompassed by the agreement, also constituted ratification, further underscoring Stouffer's right to enforce it. *See G.E. Capital Information Tech. Solutions, Inc. v. Oklahoma City Public Schools*, 173 P.3d 114, 118 (OK. App. 2007). Similarly, Defendants' silence and failure to contest the agreement encompassing Stouffer reinforces the estoppel. *Manokoune v. State Farm Mut. Auto Ins. Co.*, 145 P.3d 1081, 1087 n. 4 (OK 2006) ("At a minimum, the facts alleged by Plaintiff support consideration of the theory of 'estoppel by silence,' where 'the one who is estopped has in effect stood by and, in violation of his duty in equity and good conscience to warn another of the real facts, has permitted the other to take some action detrimental to that other's interest, [remaining] silent on some occasion when he should have spoken.'")(citation omitted). In sum, Defendants' representations, acquiescence, and silence warrant the imposition of an estoppel against them.

### e. Stouffer Is Likely to Succeed on Count XV – Violation of the RLUIPA.

Defendants' refusal to allow Reverend Potts to be present in the execution chamber during Stouffer's execution and to lay hands on him violates RLUIPA and he is likely to succeed on the merits of this claim. Their prohibition substantially burdens Stouffer's exercise of his religion, and Defendants will be unable to show that denying Stouffer the

spiritual services of Mr. Potts is the least restrictive means of furthering a compelling governmental interest. This Court should therefore declare the Defendants' refusal to be unlawful and permanently enjoin them from executing Stouffer unless they allow Reverend Potts to be present and lay hands on Mr. Stouffer during Stouffer's execution.

Moreover, the Supreme Court granted certiorari in *Ramirez v. Collier*, No. 21-5592, to decide a question nearly identical to the one presented here – whether RLUIPA requires the state of Texas to permit a spiritual advisor of the prisoner's choosing to lay hands on him and audibly pray during his execution. The Supreme Court stayed Mr. Ramirez's execution and after expedited briefing, the Court heard oral argument on November 9, 2021, and a decision in that case is expected soon. An injunction should be issued at least until the Supreme Court issues a ruling in Ramirez.

### B.  Stouffer Easily Establishes Irreparable Injury.

Stouffer will be irreparable injured if he is executed before this case can be litigated. The end of his life without opportunity to present his claims is the most "irreparable injury" any human could face. Stouffer will suffer irreparable harm of the highest order without a stay of execution, *i.e.*, he will be executed despite being prevented from asserting his rights contained within his First Amended Complaint and specifically those discussed herein. Denying a stay risks "foreclos[ing] . . . review," which constitutes "irreparable harm." *Garrison v. Hudson*, 468 U.S. 1301, 1302 (1984). Allowing the State to execute Stouffer before proceedings have concluded will deprive him of the right to be treated equally as the other 32 similarly situated individuals on Oklahoma's death row. Moreover, he will not receive the "arguable benefit" represented to him by this Court when it did not allow him

to enter the *Glossip* case as stated in its December 22, 2014, Order denying him entry into the *Glossip* case.

### C.  The Issuance of a Stay Will Not be Detrimental to the Defendants.

The executions of twenty five of the thirty one plaintiffs in the *Glossip* case are on hold pending the resolution of that case with no detriment to the same Defendants cited herein.  Stouffer's case is not different than theirs.

Moreover, should the Defendants argue that Stouffer was somehow dilatory in filing this case, Stouffer would ask the Court to look at certain pleadings in the *Glossip* case. Specifically, Motion for Additional Plaintiff to the Proceedings (*Glossip* Docket No. 107) filed on November 20, 2014, wherein Stouffer, pro se at the time, requested permission to become a plaintiff in that case.  On December 22, 2014, this court by Order (*Glossip* Docket No. 171), after Defendants objected (*Glossip* Docket No. 151), denied his request, as discussed in detail above, the result being Stouffer's reliance on the Court's December 22, 2014, Order, the State's adherence to that Order, and the State's later agreement not to execute any condemned prisoners pending the final outcome of Glossip. The Defendants should not be allowed to "eat their cake and have it too," by successfully objecting to Stouffer becoming a party in the *Glossip* case seven years ago and now claiming that they will be harmed based on the false assertion that he was dilatory.

Oklahoma will not be harmed by a stay, especially viewed in the context of its prior adherence to the Court's December 22, 2014, Order, and the State's lengthy delay in developing its new protocol. The several years the State waited to establish a new protocol undermines any argument regarding the purported urgency in proceeding with Stouffer's

execution before the courts have had an opportunity to bring the *Glossip* action to a final conclusion. The stay sought here will ensure the State does not perform an unconstitutional execution. *See Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J., dissenting from grant of writ of mandate). It will moreover preserve the integrity of the Court's December 22, 2014, Order and Stouffer's reliance thereon.

### D. It is not in the Public's Interest to Execute Stouffer Without Due Process and Equal Protection.

The United States Constitution is the backbone of the Great American Experiment. The public interest of our nation is embedded in the belief that all citizens, even those convicted of murder, shall be entitled to Constitutional protections. Stouffer has been denied access to the *Glossip* case and now individually asserts his right to not be executed in an unconstitutional manner. Allowing the State of Oklahoma to execute Stouffer without having his "day in court" would be a clear violation of due process and the Eighth Amendment. This Court must grant the preliminary injunction requested herein.

## III. CONCLUSION

The facts of this case bear out two possible conclusions. One, Stouffer is a part of the State's agreement not to execute any of the 33 Oklahoma death row inmates until they have had an opportunity to litigate their federal claims and therefore an injunction must be granted to hold the Defendants to their word. Or two, Stouffer is the only one of the 33 inmates who the State has not included in the agreement to wait until each individual's case is over and this Court must grant the injunction under the dictates of the Equal Protection Clause. There is no third alternative; this Court must grant the injunction requested herein.

Respectfully submitted this 12ᵗʰ day of November, 2021, by

_s/ Gregory W. Laird_
Gregory W. Laird, OBA # 18093
Law Office of Gregory W. Laird
P.O. Box 52043
Tulsa, OK 74152
greglairdlaw@gmail.com
(405) 264-3553

COUNSEL FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of November, 2021:

I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of Electronic Filing to all counsel of record who are registered participants in the Electronic Case Filing System.

_/s Gregory W. Laird_
**Gregory W. Laird**